[Civ. No. 16867. First Dist., Div. Two. July 25, 1956.]

DR. THOMAS FARTHING, Appellant, v. THE SAN MATEO CLINIC (a Copartnership) et al., Respondents.

Carr, McClellan, Ingersoll & Thompson, Luther M. Carr, Robert R. Thompson and Albert J. Horn for Appellant.

Hession, Robb & Creedon and Ross E. Hamlin, Jr., for Respondents.

KAUFMAN, J.—This is an appeal from a judgment in favor of defendant copartnership in an action by one of the partners to secure his share of the accounts receivable due to defendant clinic at the time of his withdrawal therefrom.

Appellant, Dr. Thomas Farthing, in his amended complaint, alleged an oral partnership agreement with his former partners and Dr. Myers, his replacement, entered into upon his return to the San Mateo Clinic on October 20, 1945, following service with the United States Army; that this agreement contained only two terms, namely, that appellant should begin immediately to receive an equal proportionate share of the current net income and that he should reach full parity with the other members of the partnership insofar as accounts receivable were concerned, in nine years after his admission and that such share in said accounts would increase proportionately during said nine-year period until he reached full parity therein.

Respondents denied that the agreement was limited to the above two terms, alleging that oral agreements with appellant were based on the written partnership agreement dated June 7, 1943, entitled "Articles of Copartnership," and conditioned on the oral agreement of appellant to abide by and accept the same terms and conditions applicable to the respondents who were then partners in the clinic. Respondents alleged that appellant's retirement and election to practice medicine in San Mateo on September 1, 1951, waived his interest in accounts receivable under article 7(e) of the 1943 copartnership agreement.

Article 7(e) of the 1943 agreement, after setting forth how the final interest in accounts receivable should be determined, provided that such sum should be paid at the rate of $400 per month until paid, and that such retiring partner shall be entitled to said monthly payments "only so long as he shall not engage in the practice of the medical profession within any of the cities of San Mateo, Burlingame and/or Hillsborough, and that upon so engaging in such medical practice within any of the said cities, his right to any of the unpaid money from the partnership shall automatically cease and terminate."

The second defense analyzed article 7(e) of the 1943 agreement as a reciprocal compensatory clause giving appellant upon retirement, the election to receive (1) an incalculable portion of the partnership's joint clientele in consideration of his waiver of his conditional right to his share of accounts receivable; or, (2) payment of his share in accounts receivable in consideration of his not taking an incalculable portion of the joint clientele.

The third defense sets forth article 7(e) as a provision for liquidated damages in event the retiring partners compete, alleging that it was the understanding of the parties that the loss to the partnership in such event would be incalculable. No express covenant not to compete was alleged. Certain known losses were alleged, one being the loss of 96 obstetrical cases from respondents' clientele with an average charge of $175 per case.

The trial court found that appellant withdrew from the clinic on August 31, 1951, and opened his office in San Mateo on September 1, 1951, for the practice of his specialties; that appellant's agreement of partnership included provisions that he would receive a full parity share in net cash receipts, and that his interest in accounts receivable would reach full

parity over a nine-year period, commencing October 20, 1945, in accordance wtih the progressive percentage formula set forth in article 4 of the 1943 articles of copartnership. It was further found that the loss was considerable, but not calculable; that the agreement provided that the retiring partner would be paid his then interest in accounts receivable at the rate of $400 per month unless he exercised his optional right to practice medicine in the city of San Mateo; that the retiring partner had the choice to practice in San Mateo or elsewhere, but that if he chose to practice in San Mateo, he agreed to waive his interest in accounts receivable as partial compensation to his partners for their incalculable loss; that appellant so waived his interest in said accounts by his election. It is our view that the findings find support in the evidence before the trial court.

At the trial there was evidence that appellant joined the San Mateo Clinic on January 1, 1940. On January 1, 1941, he became partner under articles of copartnership executed with Doctor Holmes, and respondents, Doctors Mawdsley, Prindle, Ray Mohun, Key and Knorp. This agreement did not contain a waiver clause similar to article 7(e) of the 1942 and 1943 agreements, but had been deleted from the agreements prior to its execution. Article 4 of this agreement and formula adopted by the partnership and set forth in the minutes of the February 10, 1941, meeting, established for appellant a progressive percentage formula to full parity in net cash income from 1940 to January 1, 1949, when he should reach full parity. No parity period for accounts receivable is provided for in this agreement or these minutes.

Only one partner retired from the clinic other than appellant, between 1940 and 1955, and he had received full payment for his share of accounts receivable before he returned to practice in San Mateo.

The clause relating to waiver of accounts receivable was again made part of the copartnership agreement in 1942 as article 7(e) thereof. This agreement was signed by appellant.

The 1943 copartnership agreement was signed on June 7, by the same respondents who had signed the 1942 agreement, with the addition of respondent Myers who had become associated with the clinic prior to appellant's departure for the service. This agreement was nearly identical to the 1942 agreement, differing only in that it provided for admitting Myers at full parity in net cash income and establishing a nine-year grad-

uated scale for parity in accounts receivable at the end of that period.

When appellant left for the service he was paid his full share of accounts receivable as of June 1, 1943, under article 7 of the 1942 agreement (which is the same as article 7(h) of the 1943 agreement) prior to his return to the clinic on October 20, 1945.

Appellant took part in partnership meetings at which new partners were admitted. In a meeting on March 26, 1946, he voted against, but agreed to accept the nine-year parity period in accounts receivable voted for by the majority, which appears to have been the usual period applied to a new partner. He took an active part in partnership affairs until he left the clinic. He was particularly concerned with admission of new partners and was chairman of the retirement committee from November, 1947 until December 9, 1949.

The first question to be determined is whether or not the so-called waiver or compensatory clause as set forth in article 7(h) of the 1943 agreement is a part of the oral agreement between appellant and respondents. No new written agreement was signed by the partners from 1943 until June, 1952. The 1942 agreement which appellant had signed expired by its terms in 1950, but it had been superseded by the 1943 agreement which by its terms expired December 31, 1952.

Although appellant denied having heard any discussion relative to the 1943 agreement prior to his departure for the army, the minutes of the partnership show that he attended meetings and made motions at meetings in August, October and December 1942, wherein the proposed 1943 draft of the articles was discussed. He would then have notice that this agreement was intended to govern the affairs of the partnership until 1952. He admitted having had discussions with Dr. Myers as to what terms that doctor should insist upon in the 1943 agreement, and his parity period in accounts receivable. The trial judge could therefore conclude that the appellant was fully aware that the partnership upon his return was governed by the terms of this agreement which was to extend to 1952.

Appellant was in close communication with the original partners during the period of his army service. During that time he was paid the sum of $5,224.25 at the rate of $400 per month in accordance with article 7(e) of the 1942 agreement. The 1943 agreement specifically recognized this obligation to appellant in article 7(h). Appellant visited the clinic on

February 28, 1944, and the partnership paid the premium on his malpractice insurance on September 26, 1944 when he made inquiry to the clinic concerning it. The clinic contacted him by letter of September 20, 1945, in regard to his views concerning allowing a Dr. Holmes to reenter the partnership on terms of a limited practice at variance with terms applicable to partners in appellant's specialty. This letter arranged a telephone conference to discuss the matter, and stated that the members unanimously desired that appellant and Dr. Myers continue as members.

Appellant reentered the partnership on October 20, 1945 and immediately received a full parity share in net cash income, as he had been receiving in 1943 before he left. It was not until the meeting of March 26, 1946, that terms were discussed with appellant regarding his parity period in accounts receivable. Because he had been paid off his interest in such accounts when he went into the army, it was pointed out that he would not accumulate an interest in accounts receivable to gain parity in less than the customary nine years. Appellant disagreed with this view but agreed to abide by the majority vote. It was decided that the nine-year period would apply, calculated according to the usual formula. The nine-year formula was set forth in the 1943 agreement as applied to Dr. Myers. The actual formula, however, originated in the minutes of a meeting in February 1941.

Respondent emphasizes that because appellant had been paid off his accounts receivable share in 1943, he knew from that agreement which had provisions similar to the 1943 agreement, that the parity period in article 4 had no significance except in relation to article 7 which provided for payment of that interest. It appears to be an inescapable deduction that the parity periods have no purpose except to determine the amount owing in accounts receivable to the partner upon separation from the partnership. The parity periods, apparently did not enter into the determination of current cash income of the partners.

There is evidence that at a later period appellant acknowledged the 1943 agreement as the governing partnership agreement. Respondent Knorp testified that the retirement committee considered only the 1943 agreement, rather than the 1941 and 1942 agreements in working out a retirement plan to replace article 5 of the 1943 agreement. The minutes of a meeting in 1948 show that appellant stated that the committee would continue working toward "a draft of something

that can be written into our partnership agreement'' and that it was important to set up the framework of some retirement plan now. All drafts of the plan were captioned ''Draft . . . for insertion into Partnership Agreement'' and all were numbered ''Article No. 5.''

The purpose of the waiver clause was considered at these meetings, for it was testified that the new article 5 finally adopted on December 9, 1949, as immediately effective, provided that any partner over 65 years of age might leave the clinic and practice in any location without forfeiture of his interests in accounts receivable. In view of his work on this provision, and his vote in favor of it, it can certainly be inferred that appellant had knowledge that the partners were bound by the 1943 agreement.

Other new partners were admitted after discussion with them of the terms of the partnership agreement—the 1943 agreement. Minutes of meetings accepting new members state that they were admitted ''subject to the terms of our partnership agreement.'' Dr. Knorp testified that when the partners held a meeting concerned with arranging for the construction of a new building, the 1943 agreement was read to the group. It was not referred to as the 1943 agreement, but as ''our partnership agreement.''

When appellant withdrew from the partnership, he addressed his letter to the head of the executive committee. The new article 5, adopted December 9, 1949, provided that membership of the retirement committee should be the personnel of the executive committee then in office. Although appellant claimed that a committee was to be appointed to determine procedure for his retirement, the plan outlined in the new article 5 actually was followed. This required that the retirement committee submit any retirement plan to the membership, and this was done at the meeting of June 18, 1951.

It appears that the conduct of appellant as disclosed by the above narrated events was sufficient to support an inference that he assented to be bound by the waiver provision in the 1943 articles of copartnership. Appellant cites authorities to the effect that the law will not imply specific terms of a contract such as those relating to waiver, penalty, or forfeiture, but admits that the meeting of minds may be implied from the parties' declarations and conduct. We think the conduct and declarations above discussed show that the waiver provision was a part of the partnership contract.

Is the waiver clause a valid provision? Appellant asserts that it is not, since it clearly provides for a penalty or for- The law does not favor either contracts in restraint of trade or agreements for liquidated damages. Section 16602 of the Business and Professions Code permits partners to agree that none of them will compete in a similar business in the same town or a specified part thereof. Section 1671 of the Civil Code permits the parties to a contract to so agree to liquidated damages when the amount of actual damage sustained by a breach thereof would be impracticable or extremely difficult to determine.

 Whether a covenant is for liquidated damages or for a penalty will be determined in accordance with the facts and circumstances of each case. (*Better Food Markets* v. *American Dist. Tel. Co.*, 40 Cal.2d 179 [253 P.2d 10, 42 A.L.R.2d 580].) The amount fixed as liquidated damages must represent a reasonable endeavor to estimate a fair compensation for the loss that may be sustained, and must bear some reasonable relation to such loss. (*Hill* v. *Hearron*, 113 Cal. App.2d 763 [249 P.2d 54].)

There was testimony concerning discussions as to why 7(e) was put back into the partnership agreements of 1942 and 1943, after having been deleted from the 1941 agreement. The partners recognized the fact that a doctor might leave the group and carry his patients with him and that it would be difficult to measure the loss in specific amounts because the practice was a mutual one, no one being able to claim any particular patient, that for the protection of the clinic it was felt in accounts receivable on coming into the same community to practice, that this would be a fair protection both ways.

Respondents alleged loss of 96 obstetrical cases for which the clinic charged an average of $175 per case. Appellant admitted that since his departure from the clinic he had called on it for nearly 205 case histories. Thus it can be seen that respondent in less than two years since appellant's withdrawal has already suffered a loss that may well be equivalent to or greater than the amount of appellant's share in the accounts receivable. There is no way of calculating the future loss that will be suffered through the loss of this group of patients. (See *Franz* v. *Bieler*, 126 Cal. 176 [56 P. 249, 58 P. 466]; *Potter* v. *Ahrens*, 110 Cal. 674 [43 P. 388].) It is obvious that the measure selected is reasonably related to the

anticipated loss. The interest in accounts receivable of a partner who was nearing parity would be much greater than that of one at the bottom of the scale, and a better established partner usually would take a much greater share of business from the clinic than would a partner who was not as well established.

Respondent argues that even if the clause is viewed as a forfeiture, appellant has not produced evidence to qualify for relief under section 3275, Civil Code, providing relief for forfeiture for nonwilful breach upon making full compensation. (*Bird* v. *Kenworthy*, 43 Cal.2d 656 [277 P.2d 1], *Baffa* v. *Johnson*, 35 Cal.2d 36 [216 P.2d 13]; *Barkis* v. *Scott*, 34 Cal.2d 116 [208 P.2d 367].)

The trial judge notes in his memorandum decision, which views the provision as one for liquidated damages, that both parties have agreed that the provision is illegal insofar as it attempts to apply to Burlingame or Hillsborough. (Bus. & Prof. Code, § 16602.)

The findings of fact appear to be based on the theory that the agreement gave rise to a contract giving a retiring partner the choice of continuing to practice in the same locality as the respondent by waiving his interest in accounts receivable or of practicing elsewhere and receiving payment, such waiver to constitute partial compensation for the incalculable loss thereof, although there is also a finding that it was impracticable and extremely difficult to calculate the damage in the event a partner elected to engage in practice in San Mateo.

Respondent contends that this is a true alternative contract, because appellant has the option to practice in San Mateo by giving up his interest in the accounts in return for business of the clinic which he may take away, or practicing elsewhere and collecting payment. (See 3 Williston on Contracts, rev. ed. 2194, § 781.) It was held in *Miller* v. *California Trust Co.*, that an agreement to return loaned stock or pay its value as determined at the time of the loan, was a true alternative contract since no duty was breached by failure to return the stocks. This case relied on a Massachusetts case, *Smith* v. *Bergengren*, 153 Mass. 236 [26 N.E. 690, 10 L.R.A. 768], in which defendant agreed not to practice medicine in a certain town so long as plaintiff practiced therein, but that he should have the right to practice there upon payment of a certain sum. The court held that this was a price agreed upon for the privilege of practicing there, and

not a contract for liquidated damages. However, as appellant points out, he already has the privilege of practicing medicine anywhere in this state. Respondent cannot withhold that privilege from him. That is undoubtedly true.

But appellant may contract that if he exercises that privilege he will compensate his former partners to some extent at least for the business which he expects to take from them. Such agreement cannot be held to be without consideration, for respondent clinic has undoubtedly contributed in some degree to the establishment of appellant in the community.

Appellant contends finally that an oral agreement not to compete for an unlimited time is within the statute of frauds and therefore unenforceable. (Civ. Code, § 1624, subd. 1.) This defense was raised for the first time on appeal. It is considered waived unless presented in the pleadings or during trial. (23 Cal.Jur.2d 444, § 153.)

We hold that the judgment of the trial court may be sustained on either of the two theories discussed and there being no prejudicial error in the record, the judgment may be affirmed.

Judgment affirmed.

Nourse, P. J., and Devine, J. pro tem.,* concurred.

A petition for a rehearing was denied August 24, 1956, and appellant's petition for a hearing by the Supreme Court was denied September 13, 1956.

*Assigned by Chairman of Judicial Council.