[No. S027061. Dec. 6, 1993.]

THEODORE R. HOWARD et al., Plaintiffs and Appellants, v.
GEORGE H. BABCOCK et al., Defendants and Respondents.

410

## COUNSEL

Layman, Jones & Dye, Stanley R. Jones and Ren R. Hayhurst for Plaintiffs and Appellants.

Kenneth E. Owen, Diane C. Yu, Paul W. Vapnek, Quinn, Kully & Morrow, Margaret J. Morrow, Lisa S. Kantor, Dickson, Carlson & Campillo, William B. Fitzgerald and Hall R. Marston as Amici Curiae on behalf of Plaintiffs and Appellants.

Morgan, Wenzel & McNicholas and Thomas H. Vickers for Defendants and Respondents.

Howarth & Smith, Don Howarth, Barbara Gregg Glenn, Cotkin & Collins, Bradley C. Withers and Jeffrey L. Garland as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

MOSK, J.—We granted review to decide whether an agreement between law partners is enforceable if it requires withdrawing partners to forego certain contractual withdrawal benefits if they compete with their former law firm. We conclude that an agreement among law partners imposing a reasonable toll on departing partners who compete with the firm is enforceable. We reverse the judgment of the Court of Appeal to the extent it holds the agreement unenforceable and orders an accounting to plaintiffs on that basis. We order the matter remanded to the trial court for a determination whether under the facts of this case the terms of the agreement are reasonable.

I

In 1982, partners in the law firm of Parker, Stanbury, McGee, Babcock & Combs executed a partnership agreement. Article X of the agreement provided in pertinent part that: "Should more than one partner, associate or individual withdraw from the firm prior to age sixty-five (65) and thereafter within a period of one year practice law . . . together or in combination with others, including former partners or associates of this firm, in a practice engaged in the handling of liability insurance defense work as aforesaid within the Los Angeles or Orange County Court system, said partner or partners shall be subject, at the sole discretion of the remaining non-withdrawing partners to forfeiture of all their rights to withdrawal benefits other than capital as provided for in Article V herein."[1]

Article V provided that a general partner who withdraws from the partnership shall be paid his or her capital interest, and a sum "equal to the share in the net profit of the firm that the withdrawn . . . partner would have received during the first twelve months following the withdrawal . . . . if he had remained with the firm . . . during the said twelve month period." Plaintiffs Howard, Moss and Loveder and defendants Babcock, Combs, Kinnett, Waddell, Bergsten and Schaertel signed the partnership agreement.

In January 1984, participating partners Loveder and Schaertel were elevated to general partners and Osborne and Cicotte were admitted as participating partners. Strickroth and Mori were admitted as participating partners

---

[1]Article X also provided that if only one partner withdraws, he or she is subject to forfeiture of 75 percent of withdrawal benefits for competition in Orange County or Los Angeles County, and 25 percent of withdrawal benefits if he or she competes in specified other counties.

in 1985 and Barrett was admitted as a participating partner in 1986. The partnership agreement was not amended, nor did the new partners admitted after 1982 ever sign it.

On December 8, 1986, plaintiffs (Howard, Moss, Loveder and Strickroth) notified the remaining members of the firm that they were terminating their relationship with the firm, and that they would begin practice in competition with the firm in January 1987. They asserted that article X was unenforceable. Defendants notified plaintiffs that they would withhold a portion of plaintiffs' withdrawal benefits because of plaintiffs' violation of article X. Plaintiffs replied that the partnership agreement was no longer effective, and published notice of dissolution of the firm, effective December 31, 1986.

On January 2, 1987, plaintiffs entered business in Orange County as a general partnership under the name of Howard, Moss, Loveder & Strickroth, handling, among other cases, liability defense work for insurance companies and self-insured companies. Defendants operated as a new general partnership under the name of Parker, Stansbury, McGee, Babcock & Combs.

The assets of the original Parker firm on December 31, 1986, included the capital of the firm, namely, the profits shown on the balance sheet; the accounts receivable, that is, work performed and billed, but in which the bill had not been paid; and the unfinished business, that is, open files that required additional work that would be billed in the future.

Defendants tendered payment to plaintiffs for their share of the capital of the firm, but refused to compensate them for the accounts receivable or to acknowledge that they had any interest in the work in progress or unfinished business of the firm.

Clients of the original Parker firm substituted the Howard firm in approximately 200 cases.

Plaintiffs' first amended complaint was filed on June 24, 1987, and sought an accounting of the original Parker firm's assets and liabilities as of December 31, 1986, and of the profits attributable to each party, including those arising from the unfinished business of the firm after December 31, 1986. The second cause of action alleged a breach of fiduciary duty, in that defendants had refused to account to plaintiffs for profits and unfinished business of the firm, that they refused to release plaintiffs from certain lease guaranties, and that they refused to acknowledge the right of plaintiffs to dissolve the firm and be paid for their share of the accounts receivable,

unfinished business and goodwill of the firm. Plaintiffs also sought a declaration that the partnership agreement was not in effect in December 1986, and that even if it was in effect, article X of the agreement was unenforceable. Plaintiffs also sought a declaration of the rights and duties of the parties under the agreement, and their ownership interest in the accounts receivable, unfinished business and goodwill of the firm.

In their answer, defendants denied that the partnership had dissolved before plaintiff's withdrawal, and denied that any partner had refused to be bound by the written partnership agreement before December 1986. In addition, they asserted many affirmative defenses, including claims that article X of the agreement is authorized by Business and Professions Code section 16602 and other provisions, that the partnership agreement could not be dissolved absent the consent of all the partners, estoppel, unclean hands and laches.

Defendants filed their cross-complaint on September 21, 1987, alleging that the partnership agreement contemplated the addition of new partners, and that the addition of new partners who did not execute the agreement was not intended to dissolve the partnership. The cross-complaint also alleged causes of action against plaintiffs for breach of contract, breach of the covenant of good faith and fair dealing, bad faith denial of contract, breach of fiduciary duty, conversion, fraud, a common count for money owed, an accounting, and declaratory relief. The cross-complaint sought a judicial declaration that the partnership agreement and, particularly, article X was enforceable, that plaintiffs' purported dissolution of the partnership was contrary to the terms of the agreement, and that plaintiffs had no ownership interest in the accounts receivable, fees, unfinished business, assets or goodwill of the former firm.

By stipulation of the parties, the issue of the validity and enforceability of the partnership agreement and of article X of that agreement was tried first and separately. The parties waived jury trial as to that issue only.

The trial court first decided that article X was valid and enforceable and was not against public policy, but that under Corporations Code section 15031, subdivision (7), dissolution of the partnership had occurred on January 1, 1984, when new partners were added without a new partnership agreement, a written amendment of the agreement, or the new partners' execution of the existing agreement. The court then took up the issue of what the terms of the partnership were at the time plaintiffs withdrew. After an evidentiary hearing, it determined that although the partnership was dissolved by operation of law in 1984, the partnership agreement remained

binding in all its terms.[2] Under the agreement, all that the plaintiffs were entitled to was their share of the profits for 1986. They were not entitled to any payment for goodwill or any share of the profits after 1986.

The court filed an interlocutory judgment ordering plaintiffs to provide defendants with an accounting of the net profits plaintiffs had billed or collected from clients who wanted plaintiffs to continue work in progress when plaintiffs left the Parker firm. The parties were ordered to meet and confer to resolve differences, and to apply to the court if differences could not be resolved. Defendants were ordered to account to plaintiffs for plaintiffs' shares of unpaid profits of the firm for the year 1986. The interlocutory judgment repeated that the partnership was dissolved in 1984, "but was continued as a valid partnership by agreement of the defendants and plaintiffs, who were signatories to it, at least until December 31, 1986, . . . and that article X was valid and enforceable."

Plaintiffs sought a stay and writ of mandate in the Court of Appeal, arguing that the trial court had gone beyond the stipulated issues in deciding that plaintiffs owed defendants an accounting, and that all partners of a dissolved law firm must account for the unfinished business of the firm. The Court of Appeal issued the stay and solicited informal opposition, then summarily dissolved the stay and denied the writ petition.

The trial court then entered the final judgment prepared by defendants, ordering plaintiffs to pay defendants the sum of $382,686, and finding that defendants owed plaintiffs nothing. Plaintiffs appealed, and defendants cross-appealed to the extent the judgment denied defendants relief on causes of action other than for an accounting, "contingent on reversal of any portion of the judgment that was in defendant's favor."

The Court of Appeal declared article X void. It affirmed the award to defendants, but remanded for an accounting of moneys owed to plaintiffs pursuant to the partnership agreement and the provisions of the Uniform Partnership Act. It also ordered the trial court on remand to try all causes of action not reached by the court in its interlocutory judgment.

The Court of Appeal held that one of the Rules of Professional Conduct of the State Bar, now numbered rule 1-500,[3] bans agreements, such as the one contained in article X, restricting the right of a member of the state bar to practice law. It rejected the claim that Business and Professions Code section

---

[2]The court found that plaintiff Strickroth was not bound by the agreement, and did not benefit by it.

[3]Rule 1-500 was formerly numbered rule 2-109.

16602 invalidates rule 1-500, concluding that the section is inapplicable to lawyers.

## II

■ California has a settled policy in favor of open competition. (Bus. & Prof. Code, § 16600; *Muggill* v. *Reuben H. Donnelly Corp.* (1965) 62 Cal.2d 239, 242 [42 Cal.Rptr. 107, 398 P.2d 147, 18 A.L.R.3d 1241]; *Bosley Medical Group* v. *Abramson* (1984) 161 Cal.App.3d 284, 288 [207 Cal.Rptr. 477].) Nonetheless, it has long been the law of this state that a partnership agreement may provide against competition by withdrawing partners in a limited geographical area. Thus Business and Professions Code section 16602, derived from Civil Code former section 1675, provides: "Any partner may, upon or in anticipation of a dissolution of the partnership, agree that he will not carry on a similar business within a specified county or counties, city or cities, or a part thereof, where the partnership business has been transacted, so long as any other member of the partnership, or any person deriving title to the business or its goodwill from any such other member of the partnership, carries on a like business therein."

This statutory language has been relied on in enforcing covenants not to compete among partners practicing in the professions, including accountants (*Swenson* v. *File* (1970) 3 Cal.3d 389 [90 Cal.Rptr. 580, 475 P.2d 852]) and physicians (*Farthing* v. *San Mateo Clinic* (1956) 143 Cal.App.2d 385 [299 P.2d 977]; see also *South Bay Radiology Medical Associates* v. *W.M. Asher, M.D., Inc.* (1990) 220 Cal.App.3d 1074 [269 Cal.Rptr. 15]). In fact, these agreements typically do not actually prohibit competition, but rather place a price on competition. Thus one court explained that a medical partnership cannot withhold the privilege of practicing medicine in the state, but a withdrawing partner "may contract that if he exercises that privilege he will compensate his former partners to some extent at least for the business which he expects to take from them." (*Farthing* v. *San Mateo Clinic, supra,* 143 Cal.App.2d at p. 394.)

Not every agreement between partners in restraint of competition is permitted. We have held that the common law "rule of reason" should apply to evaluate the noncompetition agreement under Business and Professions Code section 16602. (*Swenson* v. *File, supra,* 3 Cal.3d at p. 396; see also Rest.2d Contracts, § 188, pp. 45-47; 14 Williston on Contracts (3d ed. 1972) § 1636, p. 88 et seq. & § 1637, p. 103 et seq.) We explained that "[a]t common law, a restraint against competition was valid to the extent reasonably necessary for the protection of the covenantee." (*Swenson* v. *File, supra,* 3 Cal.3d at p. 396.) An earlier decision of an appellate court explained that

"[t]he amount fixed as liquidated damages [for competition] must represent a reasonable endeavor to estimate a fair compensation for the loss that may be sustained, and must bear some reasonable relation to such loss." (*Farthing* v. *San Mateo Clinic*, *supra*, 143 Cal.App.2d at p. 392.)

Until recent years, no court has considered the applicability of Business and Professions Code section 16602 to the legal profession. Now, however, a conflict has developed in the Courts of Appeal over the issue. The Court of Appeal in the case under our review held that section 16602 is not applicable to lawyers, and interpreted the Rules of Professional Conduct as prohibiting noncompetition agreements among partners in a law firm. Another court has held, to the contrary, that section 16602 applies to permit such agreements among partners in law firms. (*Haight, Brown & Bonesteel* v. *Superior Court* (1991) 234 Cal.App.3d 963, 969 [285 Cal.Rptr. 845] [hereafter *Haight*].)

■ Our first duty in interpreting a statute is to be guided by the words that appear on the face of the enactment. (*Nickelsberg* v. *Workers' Comp. Appeals Bd.* (1991) 54 Cal.3d 288, 294 [285 Cal.Rptr. 86, 814 P.2d 1328]; *Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Business and Professions Code section 16602 speaks in general terms, providing that "any partner" may agree not to compete with members of the partnership upon dissolution. Nothing in its language conveys an exception to its terms for lawyers, nor have the parties or amicus curiae directed us to any legislative history indicating that the statute was intended to apply to all partners except those who happened to be lawyers.

The original Civil Code sections regulating agreements in restraint of trade disclose no intent to except lawyers from their scope. When enacted in 1872, former section 1673 of the Civil Code provided: "Every contract by which any one is restrained from exercising a lawful profession, trade, or business of any kind, otherwise than is provided by the next two sections, is to that extent void." As for partners, former section 1675 of the Civil Code provided in 1872: "Partners may, upon or in anticipation of a dissolution of the partnership, agree that none of them will carry on a similar business within the same city or town where the partnership business has been transacted, or within a specified part thereof." While it may be true that in 1872, when these statutes were enacted, and in 1941, when section 16602 of the Business and Professions Code was enacted, it was not customary for lawyers to enter into noncompetition agreements, we do not view this historical circumstance as creating for all time an unspoken exception to the statute. In fact, the 1872 Code Commissioner's comment to the original Civil

Code sections refers to an English case enforcing a contract not to practice law at all as an example of the " 'dangerous extent' " to which contracts in restraint of trade or profession had been allowed in other jurisdictions. (Deering's Ann. Civ. Code, § 1673 (1886 ed.) p. 310.) It thus can be inferred that the practice of law was intended to be one of the professions regulated by these statutes.

Accordingly, finding no ambiguity in the terms of the statute, and finding no demonstrated legislative intent to create a silent exception for lawyers, we may apply the statute "according to its terms without further judicial construction." (*Morse* v. *Municipal Court*, *supra*, 13 Cal.3d at p. 156.) Thus, we conclude that the statute applies to partners in law firms.[4]

■ This conclusion does not end our inquiry, however. This court has the authority to prescribe rules of professional conduct for attorneys as part of its inherent power to regulate the practice of law. (*Hustedt* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 336-339 [178 Cal.Rptr. 801, 636 P.2d 1139]; see also Bus. & Prof. Code, § 6076.) It is in our power to impose a higher standard of conduct on lawyers than that applicable to other professionals. (*In re Lavine* (1935) 2 Cal.2d 324, 328 [41 P.2d 161]; accord, *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 225 [113 Cal.Rptr. 175, 520 P.2d 991]; see also *Friday* v. *State Bar* (1943) 23 Cal.2d 501, 506-507 [144 P.2d 564].)

The Court of Appeal, plaintiffs, and the State Bar of California, as amicus curiae, maintain that we have already promulgated a rule of professional conduct imposing just such a higher standard, a rule that prohibits partners in law firms from entering into noncompetition agreements. They refer us to rule 1-500 of the Rules of Professional Conduct (rule 1-500).[5]

Rule 1-500 provides: "(A) A member shall not be a party to or participate in offering or making an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of a

---

[4]We are not called upon to discuss noncompetition agreements affecting employees, as opposed to partners.

[5]Rule 1-500 is based on American Bar Association (ABA), Model Code of Professional Responsibility, former Disciplinary Rule 2-108 (1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 50, p. 70), now numbered rule 5.6 of the ABA Model Rules of Professional Conduct. Rule 5.6 provides: "A lawyer shall not participate in offering or making: [¶] (a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or [¶] (b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties." The ABA rules may be helpful in interpreting the California rules. (1 Witkin, Cal. Procedure, *supra*, Attorneys, § 313, pp. 348-349.)

member to practice law, except that this rule shall not prohibit such an agreement which: [¶] (1) Is a part of an employment, shareholders', or partnership agreement among members provided the restrictive agreement does not survive the termination of the employment, shareholder, or partnership relationship; or [¶] (2) Requires payments to a member upon the member's retirement from the practice of law; or [¶] (3) Is authorized by Business and Professions Code sections 6092.5, subdivision (i) or 6093 [providing for authority of State Bar Court to impose conditions of probation on disciplined attorneys]. [¶] (B) A member shall not be a party to or participate in offering or making an agreement which precludes the reporting of a violation of these rules."[6]

■ We are not persuaded that this rule was intended to or should prohibit the type of agreement that is at issue here. An agreement that assesses a reasonable cost against a partner who chooses to compete with his or her former partners does not restrict the practice of law. Rather, it attaches an economic consequence to a departing partner's unrestricted choice to pursue a particular kind of practice.

We agree with the Court of Appeal in *Haight*, *supra*, 234 Cal.App.3d 963, declaring an agreement between law partners that a reasonable cost will be assessed for competition is consistent with rule 1-500. Rejecting an interpretation of rule 1-500 like that proffered by plaintiffs here, the court stated: "We do not construe rule 1-500 in such a narrow fashion. . . . The rule does not . . . prohibit a withdrawing partner from agreeing to compensate his former partners in the event he chooses to represent clients previously represented by the firm from which he has withdrawn. Such a construction represents a balance between competing interests. On the one hand, it enables a departing attorney to withdraw from a partnership and continue to practice law anywhere within the state, and to be able to accept employment should he choose to do so from any client who desires to retain him. On the other hand, the remaining partners remain able to preserve the stability of the law firm by making available the withdrawing partner's share of capital and accounts receivable to replace the loss of the stream of income from the

---

[6]Rule 1-500, formerly rule 2-109, was enacted in 1989 and was recently amended, effective September 14, 1992. The only substantive change in 1992 was the addition of subdivision (A)(3), which is not relevant to our discussion in this case. Former rule 2-109 provided: "(A) A member of the State Bar shall not be a party to or participate in an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of a member of the State Bar to practice law. [¶] (B) Nothing in subdivision (A) of this rule shall be construed as prohibiting such a restrictive agreement which: [¶] (1) is a part of an employment or partnership agreement between members of the State Bar provided said restrictive agreement does not survive the term of said partnership or employment; or [¶] requires payments to a member of the State Bar upon his permanent retirement from the practice of law."

clients taken by the withdrawing partner to support the partnership's debts." (*Haight, supra*, at pp. 969-970.) Concluding that the agreement was not invalid on its face, the court held that the validity of the agreement depended on whether it "amounts to an agreement for liquidated damages or an agreement resulting in a forfeiture." (*Id.* at p. 972.)

The *Haight* court's construction is consistent with Business and Professions Code section 16602, permitting agreements between partners restricting competition. Further, our interpretation of the rule must be illuminated by our recognition that a revolution in the practice of law has occurred requiring economic interests of the law firm to be protected as they are in other business enterprises. We are confident that our recognition of a new reality in the practice of law will have no deleterious effect on the current ability of clients to retain loyal, competent counsel of their choice.

"The traditional view of the law firm as a stable institution with an assured future is now challenged by an awareness that even the largest and most prestigious firms are fragile economic units . . . ." (Hillman, Law Firm Breakups (1990) § 1.1, at p. 1.) Not the least of the changes rocking the legal profession is the propensity of withdrawing partners in law firms to "grab" clients of the firm and set up a competing practice. (Penasack, *Abandoning the Per Se Rule Against Law Firm Agreements Anticipating Competition: Comment on Haight, Brown & Bonesteel* v. *Superior Court of Los Angeles County* (1992) 5 Geo. J. Legal Ethics 889, 890 [hereafter *Abandoning the Per Se Rule*]; see also Terry, *Ethical Pitfalls and Malpractice Consequences of Law Firm Breakups* (1988) 61 Temple L.Rev. 1055, 1056-1060 [hereafter *Ethical Pitfalls*].) In response, many firms have inserted noncompetition clauses into their partnership agreements. (*Abandoning the Per Se Rule, supra*, 5 Geo. J. Legal Ethics at p. 890.) These noncompetition clauses have grown and flourished, despite, or in defiance of, the consistent holding of many courts across the nation that a noncompetition clause violates the rules of professional conduct of the legal profession. It is evident that these agreements address important business interests of law firms that can no longer be ignored.

The firm has a financial interest in the continued patronage of its clientele. (See Kalish, *Covenants Not to Compete and the Legal Profession* (1985) 29 St. Louis U. L.J. 423, 438.) The firm's capital finances the development of a clientele and the support services and training necessary to satisfactorily represent the clientele. (*Ibid.*) In earlier times, this investment was fairly secure, because the continued loyalty of partners and associates to the firm was assumed. (*Abandoning the Per Se Rule, supra*, 5 Geo. J. Legal Ethics at p. 889; *Ethical Pitfalls, supra*, 61 Temple L.Rev. at p. 1059.) But more

recently, lateral hiring of associates and partners, and the secession of partners from their firms has undermined this assumption. (*Abandoning the Per Se Rule*, *supra*, 5 Geo. J. Legal Ethics at p. 890.) Withdrawing partners are able to announce their departure to clients of the firm, and many clients defect along with the attorneys with whom they have developed good working relationships. The practical fact is that when partners with a lucrative practice leave a law firm along with their clients, their departure from and competition with the firm can place a tremendous financial strain on the firm. (See Kalish, *Covenants Not to Compete*, *supra*, 29 St. Louis U. L.J. at p. 438.)

As Chief Justice Rehnquist has observed: "Institutional loyalty appears to be in decline. Partners in law firms have become increasingly 'mobile,' feeling much freer than they formerly did and having much greater opportunity than they formerly did, to shift from one firm to another and take revenue-producing clients with them." (Rehnquist, *The Legal Profession Today* (1986) 62 Ind. L.J. 151, 152.) Not only is the income from the clientele of the firm diminished when partners withdraw and take clients with them, but the expenses attributable to the remaining partners may increase as withdrawing partners seek to escape liability for mutually incurred debt. (See *Abandoning the Per Se Rule*, *supra*, 5 Geo. J. Legal Ethics at p. 912, fn. 114; see also *Haight*, *supra*, 234 Cal.App.3d at pp. 967-970; Altman & Weil, How To Manage Your Law Office (1986) § 8.15, pp. 8-15 to 8-16.)

Recognizing these sweeping changes in the practice of law, we can see no legal justification for treating partners in law firms differently in this respect from partners in other businesses and professions.

We are aware that many courts have interpreted the rules of professional conduct of their states, often stated in identical or very similar terms with the language of our rule 1-500, as prohibiting all agreements restricting competition among lawyers, including those that merely assess a cost for competition. (*Anderson* v. *Aspelmeier, Fisch, Power, Warner & Engberg* (Iowa 1990) 461 N.W.2d 598 [forfeiture of partnership interest for causing "detriment" to firm by withdrawing and competing held void]; *Meehan* v. *Shaughnessy* (1989) 404 Mass. 419 [535 N.E.2d 1255] [interpreting agreement as permitting representation of firm's clients by departing partners in order to avoid violating rule against anticompetitive agreements]; *Jacob* v. *Norris, McLaughlin & Marcus* (1992) 128 N.J. 10 [607 A.2d 142] [agreement barring compensation, including percentage of annual draw, to withdrawing partners who represent clients of firm within a year of departure held void; but permissible to diminish payment for goodwill if departure hurts goodwill

value of firm]; *Dwyer* v. *Jung* (1975) 133 N.J.Super. 343 [336 A.2d 498] [covenant not to do business with firm's clients void]; *Cohen* v. *Lord, Day, & Lord* (1989) 75 N.Y.2d 95 [551 N.Y.S.2d 157, 550 N.E.2d 410] [agreement conditioning payment of withdrawing partner's share of net profits, including unpaid fees and work in progress, on noncompetition void]; *Hagen* v. *O'Connell, Goyak & Ball* (1984) 68 Ore.App. 700 [683 P.2d 563] [noncompetition agreement void, but might be permissible to reduce value of stock to reflect firm's loss of value when partner withdraws and competes]; *Gray* v. *Martin* (1983) 63 Ore.App. 173 [663 P.2d 1285] [voids agreement that withdrawal payments are forfeited if withdrawing partner practices law in certain geographical area]; *Spiegel* v. *Thomas, Mann & Smith, P.C.* (Tenn. 1991) 811 S.W.2d 528 [voids agreement providing for forfeiture of equity and deferred compensation for withdrawing partner who continues to practice law]; *Cohen* v. *Graham* (1986) 44 Wn.App. 712 [722 P.2d 1388] [agreement not to represent former firm's clients unenforceable].)[7]

However, we disagree with the analysis proffered by these courts to justify such an interpretation. Some courts, including the Court of Appeal in this case, reason that an attorney should have freedom to choose when, where and for whom to practice law; an anticompetitive covenant restricts that freedom. (See, e.g., *Cohen* v. *Lord, Day & Lord*, *supra*, 550 N.E.2d at p. 411.) Second, many courts reiterate that the practice of law is not a business, and clients are not commodities. These courts assert as an absolute rule that clients must have free choice of attorneys; to the extent that a restriction or toll on competition between lawyers is effective, it limits the ability of clients to have access to the attorney of their choice and is therefore improper. (See, e.g., *Jacob* v. *Norris, McLaughlin & Marcus*, *supra*, 607 A.2d at p. 147.)

Upon reflection, we have determined that these courts' steadfast concern to assure the theoretical freedom of each lawyer to choose whom to represent and what kind of work to undertake, and the theoretical freedom of any client to select his or her attorney of choice is inconsistent with the reality that both freedoms are actually circumscribed. Putting aside lofty assertions

[7]Many commentators, too, interpret the language of the standard disciplinary rules as prohibiting noncompetition agreements, including the kind of financial disincentive to competition that is at issue here, though some argue against the rule as a matter of policy. (2 Hazard & Hodes (1992 Supp.) The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct, § 5.6:101, p. 822; Hillman, *supra*, Law Firm Breakups, §§ 2.3.2-2.3.3, pp. 26-31; Comment, *Barefoot Shoemakers, an Uncompromising Approach to Policing the Morals of the Marketplace When Law Firms Split Up* (1987) 19 Ariz.St.L.J. 509, 534 [hereafter *Barefoot Shoemakers*]; Terry, *Ethical Pitfalls*, *supra*, 61 Temple L.Rev. at pp. 1071-1078; see also Kalish, *Covenants Not to Compete and the Legal Profession*, *supra*, 29 St. Louis U. L.J. at pp. 425-426, 456 [acknowledging rule but arguing for change]; Penasack, *Abandoning the Per Se Rule*, *supra*, 5 Geo. J. Legal Ethics at p. 892 [same].)

about the uniqueness of the legal profession, the reality is that the attorney, like any other professional, has no right to enter into employment or partnership in any particular firm, and sometimes may be discharged or forced out by his or her partners even if the client wishes otherwise. Nor does the attorney have the duty to take any client who proffers employment, and there are many grounds justifying an attorney's decision to terminate the attorney-client relationship over the client's objection. (See Rules Prof. Conduct, rule 3-700; 1 Witkin Cal. Procedure, *supra*, Attorneys, §§ 73-80, pp. 94-100.) Further, an attorney may be required to decline a potential client's offer of employment despite the client's desire to employ the attorney. For example, the attorney may have a technical conflict of interest because another attorney in the firm previously represented an adverse party. (Rules Prof. Conduct, rules 3-300, 3-310.) Finally, the client in the civil context, of course, ordinarily has no "right" to any attorney's services, and only receives those services he or she can afford.

Moreover, the contemporary changes in the legal profession to which we have already alluded make the assertion that the practice of law is not comparable to a business unpersuasive and unreflective of reality. Commercial concerns are now openly recognized as important in the practice of law. Indeed, we question whether any but the wealthy could enter the profession if it were to be practiced without attention to commercial success. In any event, no longer can it be said that law is a profession apart, untouched by the marketplace. Not only has law firm culture changed but, as in other businesses, lawyers now may advertise their services and may even communicate by letter with persons unknown to them, suggesting the possibility of employment. (*Shapero* v. *Kentucky Bar Assn.* (1988) 486 U.S. 466 [100 L.Ed.2d 475, 108 S.Ct. 1916]; *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691].) Thus the general rules and habits of commerce have permeated the legal profession.

The same relaxation of the traditional rule against treating a law practice as comparable to a business can be seen in the development of the rules regarding sale of goodwill in a law firm. Although in 1988 the court in *Fraser* v. *Bogucki* (1988) 203 Cal.App.3d 604 [250 Cal.Rptr. 41] rejected the concept of sale of goodwill in a law practice because it would treat clients as a commodity, the rules of professional conduct have since been amended expressly to permit the sale of goodwill in certain circumstances. (See Rules Prof. Conduct, rule 2-300.) Of course the rule requires notification to clients that the practice has been sold and that they have the right to hire new counsel, but the change does undercut the pristine view that clients are not deemed to be assets with a financial value.

Further, we question the premise that an agreement such as is at issue here would necessarily discourage withdrawing partners from continuing to represent clients who choose to employ them. Unless the penalty were unreasonable, it is more likely that the agreement would operate in the nature of a tax on taking the former firm's clients—a tax that is not unreasonable, considering the financial burden the partners' competitive departure may impose on the former firm. The sum to be forfeited by the withdrawing partners may be seen as comparable with a liquidated damages clause, an accepted fixture in other commercial contexts.[8]

In fact, it has been argued that a noncompetition agreement, or a penalty for competition, may actually serve clients as well as the financial well-being of the law firm. Without such an agreement, "[t]he culture of mistrust that results from systemic grabbing is very likely to damage, if not destroy, the law firm's stability. It is clear that when law firms dissolve, work on behalf of clients is undeniably disrupted. But even where a law firm does not self-destruct, it is easy to comprehend the disastrous impact on clients. Law firms have an affirmative obligation to the client to provide an atmosphere most conducive to the development of the attorney-client relationship and to the efficient, diligent completion of work. In an environment of pervasive lateral hiring, partners may be loath to financially or otherwise support the development of a colleague's relations with particular clients because the colleague may later exclusively usurp the benefits of that relationship. In addition, partnerships may be less willing to invest monies necessary to provide the equipment, library and other resources necessary to serve a client well if a partner could both leave a firm free of the mutually incurred liability, and also take the future income of the firm." (*Abandoning the Per Se Rule, supra,* 5 Geo. J. Legal Ethics at pp. 890-891, fns. omitted.)

It seems to us unreasonable to distinguish lawyers from other professionals such as doctors or accountants, who also owe a high degree of skill and loyalty to their patients and clients. The interest of a patient in a doctor of his or her choice is obviously as significant as the interest of a litigant in a lawyer of his or her choosing. Yet for doctors, reasonable noncompetition agreements binding upon withdrawing partners are permitted. (*South Bay*

---

[8]We note too that in some respects, the "no-compensation rule" of partnership law, whereby departing partners are compensated for winding up the unfinished business of the partnership according to their partnership interest, may be just as much a disincentive on the withdrawing partner to continue to represent clients of the firm as an anticompetitive penalty, and yet this is not considered to be a violation of rule 1-500. (*Jewel v. Boxer* (1984) 156 Cal.App.3d 171 [203 Cal.Rptr. 13]; Corp. Code, § 15018, subd. (f); see also *Rosenfeld, Meyer & Susman v. Cohen* (1983) 146 Cal.App.3d 200, 219 [194 Cal.Rptr. 180]; Note, *Winding Up Dissolved Law Partnerships: The No-Compensation Rule and Client Choice* (1985) 73 Cal.L.Rev. 1597, 1598-1599.)

*Radiology Medical Associates* v. *W.M. Asher, M.D., Inc., supra,* 220 Cal.App.3d 1074 [physicians]; *Farthing* v. *San Mateo Clinic, supra,* 143 Cal.App.2d 385 [same]; see also *Swenson* v. *File, supra,* 3 Cal.3d 389 [accountants]; Hillman, Law Firm Breakups, *supra,* § 2.3.2, p. 29; *Barefoot Shoemakers, supra,* 19 Ariz.St.L.J. at p. 533.)

We are confident that the interest of the public in being served by diligent, loyal and competent counsel can be assured at the same time as the legitimate business interest of law firms is protected by an agreement placing a reasonable price on competition. We hold that an agreement among partners imposing a reasonable cost on departing partners who compete with the law firm in a limited geographical area is not inconsistent with rule 1-500 and is not void on its face as against public policy.

We seek to achieve a balance between the interest of clients in having the attorney of choice, and the interest of law firms in a stable business environment. We have recognized that restraint of competition among partners is permissible only to the extent it protects the reasonable interests of the business seeking the restraint. (See *Swenson* v. *File, supra,* 3 Cal.3d at p. 396.) We consider it obvious that an absolute ban on competition with the partnership would be per se unreasonable, and inconsistent with the legitimate concerns of assuring client choice of counsel and assuring attorneys of the right to practice their profession. We agree with the court in *Haight, supra,* 234 Cal.App.3d 963, however, that to the extent the agreement merely assesses a toll on competition within a specified geographical area, comparable to a liquidated damage clause, it may be reasonable. (*Id.* at pp. 970-971; see also *Farthing* v. *San Mateo Clinic, supra,* 143 Cal.App.2d at pp. 392-393.)

█ As we have said with respect to liquidated damage clauses, "a contractual provision specifying damages for breach [of contract] is valid only if it 'represent[s] the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.' [Citations.] An amount disproportionate to the anticipated damages is termed a 'penalty.' A contractual provision imposing a 'penalty' is ineffective, and the wronged party can collect only the actual damages sustained." (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 930-931 [216 Cal.Rptr. 345, 702 P.2d 503]; see Civ. Code, § 1671.) Under this standard, a partner's agreement to pay former partners, or to forego benefits otherwise due under the contract, in an amount that at the time of the agreement is reasonably calculated to compensate the firm for losses that may be caused by the withdrawing partner's competition with the firm, would be permitted.

We have reviewed the arguments of the dissenting opinion with appropriate concern. It is not our intent to relegate clients to the position of

commodities, nor to elevate commercial concerns over the lawyer's bedrock duty of loyal and vigorous advocacy on behalf of the client. Rather, we have exercised our duty to regulate the practice of law with a care to understanding the world as it is, uninfluenced by rhetoric that appears to obscure, rather than clarify, the problem. We are confident that our opinion will leave the lawyer's professional duties to his or her clients undisturbed, and that clients will enjoy the same degree of choice in retaining attorneys as they have always possessed.

## III

The judgment of the Court of Appeal is reversed to the extent it holds article X unenforceable and orders an accounting to plaintiffs on that basis. The judgment of the Court of Appeal is otherwise affirmed.[9] We direct that the Court of Appeal remand the matter to the trial court for a determination, consistent with our opinion, whether the terms of article X are reasonable, and for any further award on the accounting causes of action made necessary by that determination.

Lucas, C. J., Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

**KENNARD, J.,** Dissenting.—Should an attorney who leaves a law firm be free to compete with that firm? In this state, as in many others, attorneys are bound by a rule of ethics that prohibits them from entering into agreements that "restrict" their right to practice law after leaving a firm. (Rules Prof. Conduct of State Bar, rule 1-500.) The rule serves to eliminate unnecessary and artificial restrictions on clients' ability to select their attorneys. Yet, the majority, contrary to the unambiguous language of the rule, holds that this rule does not bar law firms from entering into noncompetition agreements with their attorneys if such agreements are "reasonable." I disagree.

In the majority's view, whether a noncompetition agreement is "reasonable" depends not upon its effect on the rights of clients, but upon whether it serves to protect and preserve the financial stability of existing law firms. (Maj. opn., *ante*, at pp. 419, 423.) The majority insists that "a revolution in the practice of law has occurred requiring economic interests of the law firm to be protected as they are in other business enterprises." (*Id.* at p. 420.) The majority says that changes in the economics of law practice "make the assertion that the practice of law is not comparable to a business unpersuasive and unreflective of reality." (*Id.* at p. 423.) I do not accept the majority's

---

[9]Our grant of review was limited to the question whether article X of the partnership agreement is void, and our reversal only affects the judgment of the Court of Appeal to the extent that court's orders were based on the conclusion that article X of the partnership agreement is void.

conclusion that "a new reality in the practice of law" (*id.* at p. 420.) justifies its erosion of legal ethical standards.

Although the law is a business in the sense that an attorney in a law firm earns a living by practicing law, it is also and foremost a profession, with all the responsibilities that word implies. The ethical rule that this court is called upon to interpret exists to enforce the traditional and sound view that service to clients, including protection of the clients' ability to employ the attorneys they have come to trust, is more important than safeguarding the economic interests of established attorneys and law firms. I would enforce the rule according to the ordinary meaning of its terms to bar all agreements by which established firms seek to protect themselves against competition from attorneys who leave the firm.

I cannot accept that the practice of law has been so altered that it is now irretrievably profit-centered rather than client-centered. If ethical rules for attorneys must accommodate the "realities" of practicing law, then those realities ought to include this court's insistence that attorneys serve more than their own interests and accomplish more than amassing fees. Protection of the public and preservation of public respect for the law require no less.

## I.

Before January 1987, plaintiffs were partners in the law firm of *Parker, Stanbury, McGee, Babcock & Combs* (the Parker firm). The partnership agreement contained a covenant not to compete. The covenant restricted a partner who withdrew from the firm before age 65 from engaging in liability insurance defense work within the Los Angeles or Orange County court systems for one year following the partner's withdrawal from the firm. If a partner violated the restrictive covenant, then, "at the sole discretion of the remaining non-withdrawing partners," all rights to withdrawal benefits other than capital would be subject to forfeiture.

In December 1986, plaintiffs notified the Parker firm that they were terminating their relationship with the firm and would begin competing with the Parker firm in January 1987. Defendants, the remaining members of the Parker firm, informed plaintiffs that they would withhold part of the withdrawal benefits because of plaintiffs' violation of the covenant not to compete.

In January 1987, plaintiffs began handling liability insurance defense matters for clients in the new law firm of Howard, Moss, Loveder & Strickroth (the Howard firm). Clients in approximately 200 cases chose to be represented by the Howard firm instead of the Parker firm.

Defendants offered to pay plaintiffs their share of the capital of the Parker firm, but refused to pay plaintiffs for their share of work in progress (work completed but not yet billed) and accounts receivable (work billed but payment not yet received). Defendants also refused to acknowledge that plaintiffs had any interest in the unfinished business of the firm, that is, cases that required additional work to be done.

Plaintiffs then brought this action for, among other things, an accounting of the Parker firm's assets and liabilities and for a declaration that the covenant not to compete was unenforceable. Defendants answered and cross-complained. The issue of the enforceability of the covenant not to compete was, by stipulation, tried first.

The trial court, sitting without a jury, ruled that the covenant not to compete was valid and enforceable. In an interlocutory judgment, the court ordered plaintiffs to account for the net profits attributable to work performed after plaintiffs left the Parker firm on cases commenced before plaintiffs left the firm. Defendants were ordered to account for plaintiffs' share of the Parker firm's unpaid profits for the year 1986.

The trial court subsequently entered a final judgment ordering plaintiffs to pay the Parker firm 82.5 percent of the net profits received for work plaintiffs performed for former Parker firm clients after plaintiffs had left the Parker firm. The court found that defendants did not owe plaintiffs anything.

## II.

Rule 1-500 of the Rules of Professional Conduct of the State Bar of California (hereafter rule 1-500) prohibits agreements that restrict an attorney's right to practice law following the termination of a professional relationship among attorneys. "The Rules of Professional Conduct are intended not only to establish ethical standards for members of the bar [citation], but are also designed to protect the public." (*Ames* v. *State Bar* (1973) 8 Cal.3d 910, 917 [106 Cal.Rptr. 489, 506 P.2d 625].) The prohibition against restrictive covenants contained in rule 1-500 has been part of our Rules of Professional Conduct since 1975, and was most recently approved by this court (Bus. & Prof. Code, § 6077) on August 13, 1992.

Rule 1-500 unambiguously states: "(A) A member shall not be a party to or participate in offering or making an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement *restricts* the right of a member to practice law, except that this rule shall not prohibit such an agreement which: [¶] (1) Is a part of an employment, shareholders', or

partnership agreement among members *provided the restrictive agreement does not survive the termination of the employment, shareholder, or partnership relationship . . . .*" (Italics added.)

The Rules of Professional Conduct are followed by discussions that "provide guidance for interpreting the rules and practicing in compliance with them." (Rules Prof. Conduct, rule 1-100(C).) The discussion accompanying rule 1-500 says: "Paragraph (A) permits a restrictive covenant in a law corporation, partnership, or employment agreement. The law corporation shareholder, partner, or associate may agree not to have a separate practice during the existence of the relationship; *however, upon termination of the relationship (whether voluntary or involuntary), the member is free to practice law without any contractual restriction . . . .*" (Italics added.)

Courts in a number of other states that have interpreted rules of professional conduct identical or substantially similar to rule 1-500 have recognized that a covenant not to compete violates the pertinent rule of ethics because it "restricts" the departing lawyer's practice of law. (E.g., *Jacob* v. *Norris, McLaughlin & Marcus* (1992) 128 N.J. 10 [607 A.2d 142]; *White* v. *Medical Review Consultants, Inc.* (Mo.Ct.App.1992) 831 S.W.2d 662; *Spiegel* v. *Thomas, Mann & Smith, P.C.* (Tenn. 1991) 811 S.W.2d 528; *Anderson* v. *Aspelmeier, Fisch, Power, Warner & Engberg* (Iowa 1990) 461 N.W.2d 598; *Miller* v. *Foulston, Siefkin, Powers & Eberhardt* (1990) 246 Kan. 450 [790 P.2d 404]; *Cohen* v. *Lord, Day, & Lord* (1989) 75 N.Y.2d 95 [551 N.Y.S.2d 157, 550 N.E.2d 410]; *Meehan* v. *Shaughnessy* (1989) 404 Mass. 419 [535 N.E.2d 1255]; *Kelly* v. *Smith* (Ind.Ct.App. 1992) 588 N.E.2d 1306; *Ohio Urology, Inc.* v. *Poll* (1991) 72 Ohio.App.3d 446 [594 N.E.2d 1027]; *Williams & Montgomery, Ltd.* v. *Stellato* (1990) 195 Ill.App.3d 544 [142 Ill.Dec. 359, 552 N.E.2d 1100]; and *Gray* v. *Martin* (1983) 63 Ore.App. 173 [663 P.2d 1285].) Various legal commentators agree. (E.g., 2 Hazard & Hodes (1992 Supp.) The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct, § 5.6:101, p. 822; Terry, *Ethical Pitfalls and Malpractice Consequences of Law Firm Breakups* (1988) 61 Temple L.Rev. 1055, 1071-1078.)

Here, the judgment of the trial court, which upheld the restrictive covenant, directed plaintiffs, the former partners, to pay the law firm 82.5 percent of the profits derived from work plaintiffs performed *after* the termination of the partnership. To order an attorney to surrender 82.5 percent of the income obtained from representing clients is to restrict the attorney's practice of law in any meaningful sense of the word. The economic disincentives flowing from such an order may encourage the lawyer to give up the clients, "thereby interfering with the lawyer-client relationship and, more importantly, with

clients' free choice of counsel." (*Jacob* v. *Norris, McLaughlin & Marcus, supra,* 128 N.J. at p. 22 [607 A.2d at p. 148].)

According to the majority, however, covenants not to compete do not restrict the practice of law if they assess a "reasonable cost against a partner who chooses to compete with his or her former partners . . . ." (Maj. opn., *ante,* at p. 419.) I disagree.

As I pointed out earlier, the majority's conclusion is at odds with the great weight of authority. Also, in determining reasonableness based on the relationship between or among attorneys, the majority gives little regard to the relationship between the attorney and the client. Moreover, the majority fails to recognize that restrictive covenants are intended to and do restrict the practice of law. Rule 1-500 proscribes agreements that "restrict" the practice of law, not just those that prohibit "altogether" the practice of law. (Contra, *Haight, Brown & Bonesteel* v. *Superior Court* (1991) 234 Cal.App.3d 963, 969 [285 Cal.Rptr. 845] [rule 1-500 "simply provides that an attorney may not enter into an agreement to refrain altogether from the practice of law"].) To "restrict" means to restrain, to confine within bounds. (Webster's New Collegiate Dict. (9th ed. 1988) p. 1006.) To "prohibit" means to prevent, to forbid. (*Id.* at p. 940.) The terms are not synonymous.

Covenants not to compete restrict the practice of law. Unable to show otherwise, the majority refuses to honor the plain meaning of rule 1-500, which expressly prohibits attorneys from entering into agreements that "restrict" their right to practice law after leaving a law firm. But the majority does not stop there. It proceeds to make the practice of law less of a profession by devaluing the rights of clients in favor of the economic interests of law firms, as I shall discuss below.

### III.

A profession has ideals and objectives beyond economic success. As Dean Roscoe Pound observed: "It would be idle to assert that there is nothing of selfishness in the pursuit of a profession. But its ideal is not one of individual success in competitive acquisitive activity. And because ideals operate powerfully to shape action, professional activity, even at its worst, is restrained and guided by something better than the desire for money rewards." (Pound, *What is a Profession? The Rise of the Legal Profession in Antiquity* (1944) 19 Notre Dame L.Rev. 203, 205.)

One of the objectives beyond economic success that defines the law as a profession is the recognition that the attorney-client relationship requires the

acceptance, within the bounds of ethical propriety, of the principle that the client's fundamental rights are superior to the interests of the attorney.

The attorney-client relationship involves more than monetary considerations. An attorney is a fiduciary of the "very highest character." (1 Witkin, Cal. Procedure (3d ed. 1985), Attorneys, § 95, p. 113, quoting *Cox* v. *Delmas* (1893) 99 Cal. 104, 123 [33 P. 836].) By the very nature of the relationship, an attorney owes the client a duty to act with the highest good faith. (*Rader* v. *Thrasher* (1962) 57 Cal.2d 244, 250 [18 Cal.Rptr. 736, 368 P.2d 360].) Consistent with the fiduciary nature of the relationship, the duty of the attorney includes placing the interest of the client above his or her own interest. Attorneys must, for example, "maintain inviolate the confidence, and at every peril to himself or herself preserve the secrets, of his or her client." (Bus. & Prof. Code, § 6068, subd. (e).) And, consistent with the unique relationship between attorney and client, the client's right to retain counsel of his or her choice is superior to the interest of the attorney. (*Fracasse* v. *Brent* (1972) 6 Cal.3d 784, 790 [100 Cal.Rptr. 385, 494 P.2d 9]; *Estate of Cazaurang* (1934) 1 Cal.2d 712, 714 [36 P.2d 1069].)

To enforce covenants not to compete is to exalt the economic interest of established law firms while necessarily disfavoring the rights of clients, especially the right to the attorney of one's choice. The majority's "confidence" that its decision will have no effect on the right of a client to the attorney of the client's choice (maj. opn., *ante*, at pp. 420, 426 is unrealistic. As the New Jersey Supreme Court observed recently: "By forcing lawyers to choose between compensation and continued service to their clients, financial-disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer-client relationship and, more importantly, with clients' free choice of counsel. Those provisions thus cause indirectly the same objectionable restraints on the free practice of law as more direct restrictive covenants. . . . Because the client's freedom of choice is the paramount interest to be served by the [rules of professional conduct], a disincentive provision is as detrimental to the public interest as an outright prohibition." (*Jacob* v. *Norris, McLaughlin & Marcus, supra*, 128 N.J. at p. 22 [607 A.2d at pp. 148-149].)

The majority nevertheless diminishes the rights of clients by treating them as no more important than "the interest of law firms in a stable business environment." (Maj. opn., *ante*, at p. 425.) The majority justifies its erosion of clients' rights, the integrity of the attorney-client relationship, and the fiduciary role of attorneys by announcing that the clients' right to select their own attorneys is "theoretical" and inconsistent with "reality." (*Id.* at p. 422.)

The majority lists a number of factors that it believes demonstrate that the rights of clients are "theoretical" and that concern with their protection is out

of touch with "reality." The majority views clients' rights as theoretical, not real, because an attorney (1) does not have a right to be a partner in a law firm, (2) may be forced out of a law firm by the remaining partners, (3) does not have to accept representation of any client, (4) may in some circumstances withdraw from the attorney-client relationship, and (5) may be required to decline representation because of a conflict of interest. (Maj. opn., *ante*, at pp. 422, 423.) In addition, the majority states that a client has no right to an attorney unless the client can afford the attorney's services. (*Id.* at p. 424.)

The majority's list reflects rationalization, not reasoning. The fact that an attorney does not have a right to be a partner in a law firm or has been forced out of a law firm has no bearing on the issue in this case. Nor does the possibility that an attorney may be unwilling or unable to represent a client address the question we face here, which is whether a law firm can prevent a willing attorney from representing a willing client.

The majority's justifications for diminishing the rights of clients and undermining the special relationship between the attorney and the client do not support its holding. Equally unpersuasive are the majority's further justifications based on its view of the realities and equities of the practice of law.

## IV.

The majority maintains that its interpretation of ethical standards is justified because an economic "revolution" has occurred in the practice of law. It asserts that its holding is warranted because law firms, including those that are large and prestigious, are adversely affected by withdrawing partners "grabbing" clients, law firms are intentionally ignoring the rules of ethics in any event, law firms have a financial interest in their clients, the law firm's capital financed the development of the clientele, law firms may be economically injured by the loss of clients, and other businesses and professions are permitted to have anticompetition agreements.[1] (Maj. opn., *ante*, at pp. 419-420.)

I have no quarrel with the majority's assertions that former partners sometimes "take" clients from law firms, that law firms have a financial

---

[1]The majority goes to great lengths to interpret and comment on Business and Professions Code section 16602, which allows general business partners to agree, "upon or in anticipation of a dissolution of the partnership," that they will not compete in specified counties or cities. (Maj. opn., *ante*, at pp. 416-418.) The majority then recognizes, however, that this statute does not control this case because it is the responsibility of this court to prescribe the rules of ethics for the practice of law. (*Id.* at p. 418.)

interest in their clientele, or that law firms may be economically injured by the loss of clients.

But the purpose of rules of professional ethics is to restrain and guide the conduct of attorneys and to protect the public, not to protect the financial interests of law firms. (*Ames* v. *State Bar*, *supra*, 8 Cal.3d at p. 917.) Accordingly, I cannot accept the majority's view that the protection of law firms justifies devaluing the rights of clients. There is no reason to assume that the controlling partners of established law firms have a moral entitlement to protection from competition.

Indeed, a withdrawing partner's decision to leave a firm may be fully justified. For example, the withdrawal may be the result of unwillingness by nonproductive partners to fairly share income with productive partners, associates, and other personnel in the law firm. In other words, there is as much reason to assume that the withdrawal is caused by the remaining partners' undue emphasis on maximizing profits as there is to assume that fault lies with the withdrawing attorney.[2]

Nor can I share the majority's view that noncompetition agreements are justified because "[t]he firm's capital finances the development of a clientele and the support services and training necessary to satisfactorily represent the clientele." (Maj. opn., *ante*, at p. 420.) Clients remain loyal to a firm for many reasons that have no connection to existing partners' capital. The labor and efforts of attorneys and other employees of law firms contribute much more to the recruitment, retention, and development of clients than the capital of a law firm. Indeed, if a client chooses to be represented by a departing attorney rather than the law firm, that choice is generally based on the client's trust and confidence in the withdrawing attorney.

The majority's remaining arguments—that other businesses are permitted to have covenants not to compete and that law firms are already consciously engaged in violating the ethical rules—merit only brief mention.

Although other businesses and professions permit noncompetition agreements, the rules applicable to other professions do not necessarily provide guidance for the legal profession. The nature, ideals, and practices of the various professions are different. Moreover, ethics is not a subject in which the objective is to achieve consensus at the level of the lowest common denominator. In my view, attorneys should strive to, and should be required to, meet the highest ethical standards.

---

[2]The majority has made no effort to show that because of the economic "revolution" in the practice of law it asserts has taken place, law firms in jurisdictions that do not allow restrictive covenants have suffered greatly. I am doubtful such evidence exists.

The majority's assertion that law firms have knowingly defied the ethical rules by promulgating covenants not to compete likewise does not support its holding. The assertion, if true, demonstrates only the need for resolute action by this court to protect the legal profession from the insidious effects of an overzealous pursuit of economic gain.

As Chief Justice Rehnquist of the United States Supreme Court has observed: "It is only natural, I suppose, that as the practice of law in large firms has become organized on more and more of a business basis, geared to the maximization of income, this practice should on occasion push towards the margins of ethical propriety. Ethical considerations, after all, are factors which counsel *against* maximization of income in the best Adam Smith tradition, and the stronger the pressure to maximize income the more difficult it is to avoid the ethical margins." (Rehnquist, *The Legal Profession Today* (1986) 62 Ind. L.J. 151, 154, italics in original.) In my view, the increasing pressures to weaken the rules of professional ethics generated by the emphasis on maximizing income require more, not less, vigilance by this court to preserve the practice of law as a profession and to protect the public.

## V.

If the practice of law is to remain a profession and retain public confidence and respect, it must be guided by something better than the objective of accumulating wealth. Here, in refusing to enforce a rule of ethics that prohibits attorneys from entering into agreements that restrict their right to practice law after leaving a firm, the majority diminishes the rights of clients in favor of the financial interest of law firms based on its one-sided view of the realities and equities of the practice of law.

I would affirm the judgment of the Court of Appeal.

Appellants' petition for a rehearing was denied February 3, 1994. Kennard, J., was of the opinion that the petition should be granted.