Hinkle, J.
Plaintiffs Richard H. Pettingell (“Pettingell”) and Joseph A. Regan (“Regan”) filed this action against the law firm and partners of Morrison, Mahoney & Miller, pleading breach of contract and breach of fiduciary duty, and seeking declaratory relief. Morrison, Mahoney & Miller counterclaimed against the plaintiffs, demanding repayment of funds allegedly owed. The plaintiffs have moved for judgment on the pleadings under Mass.R.Civ.P. 12(c). Morrison, Mahoney & Miller has moved for summary judgment under Mass.R.Civ.P. 56 and contends that the plaintiffs’ 12(c) motion should be converted to a Rule 56 motion. In response, the plaintiffs have moved to strike the Rule 56 materials submitted by the defendants, or in the alternative, for severance and a continuance under Rule 56(f) for the preparation of responsive Rule 56 materials. For the following reasons, plaintiffs’ motion for judgment on the pleadings is converted into a motion for summary judgment and is ALLOWED. The defendants’ motion for summary judgment, along with the parties’ other motions, are DENIED.
BACKGROUND
The undisputed facts set out in the pleadings axe as follows.[3] The plaintiffs are attorneys admitted to practice in the Commonwealth of Massachusetts and former partners at the law firm of Morrison, Mahoney & Miller. Pettingell became a partner on August 1, 1982; Regan became a partner on August 1, 1987. At the time they became partners, the plaintiffs agreed to be bound by the provisions of the Morrison, Mahoney & Miller Partnership Agreement.
On August 13, 1993, the plaintiffs voluntarily withdrew from Morrison, Mahoney & Miller and formed a new law firm under the name of Pettingell and Regan. As a result of their withdrawal, the plaintiffs allege that they are entitled to the payment of capital and accrued income from Morrison, Mahoney & Miller (Complaint, ¶9). Morrison, Mahoney & Miller and its partners allege that, at the time the plaintiffs withdrew from Morrison, Mahoney & Miller, they had negative cash basis capital accounts. Defendants argue that the plaintiffs now have a duty to pay Morrison, Mahoney & Miller a sum equivalent to the negative balances on these accounts (Defendant’s Answer and Counterclaim, ¶6, ¶7).
The Morrison, Mahoney & Miller Partnership Agreement (“the agreement”) contains the following provisions relevant to the payments owed to withdrawing partners. Partners at Morrison, Mahoney & Miller are allocated two sources of income under the agreement: the right to receive annual minimum drawing accounts and annual partnership interest credits. Section IV, C defines the “Annual Minimum Drawing Accounts” as an amount of cash income allocated annually to each full-time or part-time partner by majority vote of the entire partnership. Section IV, E defines the “Annual Partnership Interest Credit”: a system by which the increase or decrease in the net worth of the firm, computed annually on an accrual accounting basis, is divided into portions and allocated individually to each partner.
Section IV, A, 1 defines the capital contribution made by each partner upon attaining partner status as the “Paid-in Capital Account.” Section IV, D defines “Units of Participation”: units awarded each partner each year by vote of the other partners. The units of participation determine the share of each active and semi-active partner in the net cash profits or losses in any particular fiscal year (§IV, D, 3), and the votes allocated to each partner for the making of management decisions (§V, B, 1). The annual partnership interest credit, an accounting device, is a measure given to the partners to compensate them when the firm’s net worth increases on an accrual basis, but outstanding accounts receivable or other factors prevent the firm’s net worth from increasing by a similar *216 amount on a cash basis (§IV, E, 1(a)). The accrual accounting of the partnership’s assets includes an accounting of unbilled but completed legal work, un-reimbursed disbursements made on behalf of clients, and contingent amounts representing the estimated potential recoveries in subrogation cases (§IV, F, 2). Annual partnership interest credits are divided among the partners according to their respective units of participation (§IV, E, 1(b)). The credits translate into additional cash compensation for the partners only when the firm’s operations show a cash surplus from that year’s operations (§IV, E, 3). In years when the firm suffers a loss on an accrual basis, negative annual partnership interest credits are awarded each partner, carried over, and offset against the partners’ future annual partnership interest credits (§IV, E, 3). On December 31, 1992, Pettingell had collected $530,075 and Regan had collected $47,400 annual partnership interest credits, according to the Morrison, Mahoney & Miller Schedule of Partners’ Capital Accounts.[4]
Under the terms of §IV, E, 3 of the agreement, after the payment of expenses, the firm’s annual net income is used to pay each partner his or her annual minimum drawing accounts. Once these payments are made, further payments are made to retired and deceased partners. If a cash surplus remains, 50% of this surplus is paid as extra compensation to partners who have positive annual partnership interest credits. The first credits satisfied are those earned by partners in the earliest remaining outstanding years. If more credits remain outstanding in a particular year than can be paid out of cash surplus, the credits for that year are partially satisfied on a pro rata basis. The remaining surplus is either used to increase the partners’ paid-in capital accounts, entitling them eventually to more units of participation, or disbursed pro rata among the partners.
Regarding termination of partnership, the agreement states at §111, B, 3:
An active or semi-active partner’s interest in the firm and all his right, title and interest in its property and his Units of Participation, as hereinafter described, in its earnings shall terminate automatically upon the partner’s death or expulsion or in the event that the partner withdraws or retires from the firm or becomes permanently and totally disabled . . . Upon termination of his partnership, a partner shall be entitled to rights with respect to Paid-In Capital accounts, as hereinafter described, net income and assets and shall have such financial and other obligations to the firm, all as set forth in this Agreement.
The agreement further provides that, on the death of a partner, the firm shall pay to that partner’s estate an amount corresponding to the highest minimum annual drawing account awarded that partner in the preceding four years, plus the amount of cash profits for that year equivalent to the deceased partner’s units of participation, plus a ten-year installment payment equal to the partner’s uncompensated annual partnership interest credits (§VII, A). In the event of a partner’s retirement, an identical payment is made to departing partners unless they “return to practice other than to the continuing firm" (§VII, B).
A different scenario operates where a partner voluntarily withdraws (§VII, D). Initially, the withdrawing partner is entitled to the same payment scheme granted to deceased partners (§VII, D, 2), less the payment of the highest minimum annual drawing account of the prior four years. The agreement then states at §VII, D, 3:
In the event of such voluntary withdrawal under circumstances where the withdrawing partner engages in any activities which are in competition with the then current activities of the firm, he shall forfeit all of the benefits and rights described [as being awarded to the estates of deceased partners). It is understood and agreed that a withdrawing partner shall have the right to represent as attorney at law those persons designated in the records of the firm as personal clients of the withdrawing partner, which activity shall not be deemed to be in competition with the firm.
Section X, L determines a system by which departing attorneys can take open cases with them, reimbursing Morrison, Mahoney & Miller for the dollar value of the work-in-progress and disbursements allocated to the file. Section X, N states:
In the event a partner shall terminate as a partner for any reason and shall within the five years following his termination, or such longer period during which he shall be entitled to payments from the firm hereunder, engage in activities which are competitive to those of the firm, he shall forfeit all remaining payments due to him hereunder and shall thereupon return to the firm the amount of any payments which may have been made to him by the firm pursuant to this Agreement following his termination as a partner. For the purposes of determining whether a terminated partner is engaging in activities in competition with the firm, due regard shall be given to the client base, the areas of the firm’s expertise and the location of the firm’s offices at the time that the competition arises. The firm’s practice shall not be considered as limited to Massachusetts or to insurance defense work, nor shall it be strictly determined to be limited to providing legal representation.
Section X, O states:
The firm shall have the right to set off against payments due to any partner who terminates with the firm any damages resulting from breach by the terminating partner of any of the provisions of this Agreement and any other sums which may be due from such terminating partner.
*217 The plaintiffs argue that several provisions of the agreement constitute illegal forfeiture-for-competition clauses, and that they are consequently owed the payments they would have received had they not entered into competition with the firm. Morrison, Mahoney & Miller asserts that, while at the firm, the plaintiffs borrowed against their original capital contributions and left with negative capital balances of $116,392.00 for Pettingell and $30,316.00 for Regan. Morrison, Mahoney & Miller asks that these debts be offset against any damages recovered by the plaintiffs.
DISCUSSION
This case hinges on whether the clauses in §VII, D, 3 and §X, N of the Morrison, Mahoney & Miller partnership agreement, and stated above (hereafter known as “the forfeiture-for-competition clauses”) are enforceable or void as against public policy. However, before this issue can be reached, it is necessary to consider the procedural stage at which resolution of this controversy is appropriate.
I. The Propriety of Plaintiffs’ Rule 12(C) Motion
The plaintiffs have moved for judgment on the pleadings under Mass.R.Civ.P. 12(C).[5] This device was once considered designed only for “the rare case where the answer admits all the material allegations of the complaint.” Reporter’s Notes to Mass.R.Civ.P. 12. “If the answer denies any material allegation in the complaint, or raises at least one legally sufficient affirmative defense, judgment on the pleadings will not lie, although summary judgment may.” Smith & Zobel, Rules Practice §12.16 (1974 & 1996 pocket part).
While Morrison, Mahoney & Miller does not deny or challenge any of the material facts offered by the plaintiffs in their complaint,[6] Morrison, Mahoney & Miller alleges two affirmative defenses in its answer, estoppel and waiver. Since the defendants have pled two “legally sufficient” affirmative defenses, disposition of this case under a 12(C) motion is inappropriate.
Where material facts are disputed, or sufficient affirmative defenses raised, Rule 12(C) permits the Court to treat plaintiffs’ motion for judgment on the pleadings as a summary judgment motion. Additionally, Rule 12(C) mandates that a motion for judgment on the pleadings be converted into a motion for summary judgment when “matters outside the pleadings are presented to and not excluded by the court.” Interpreting these words in the context of the conversion of a Rule 12(b)(6) motion to a summary judgment motion, the. Supreme Judicial Court stated that “the category of‘matters outside the pleading’ is broad, but even when construed broadly, such matters must provide some relevant, factual information to the court.” Stop & Shop Cos., Inc. v. Fisher, 387 Mass. 889, 892 (1983).
The defendants, who have moved themselves for summary judgment, have supplied the Court with factual information that includes an affidavit of Alan G. Miller, managing partner of Morrison, Mahoney & Miller. The Miller affidavit contains information relevant to the construction of the Morrison, Mahoney & Miller partnership agreement. First, Miller describes the drafters’ intentions at the time the 1968 partners’ agreement was replaced by the 1989 agreement (the agreement that is the subject of this case) and new provisions drafted, including §X, N and §VII, D (Affidavit of Alan G. Miller at ¶¶17-19). Second, Miller discusses the drafters’ intentions behind the annual partnership interest credits system, and describes the way in which the system worked in practice (Affidavit of Alan G. Miller at ¶¶6-12). As will become apparent below, the relevance of this factual information cannot be determined without reference to the substantive law governing the enforceability of forfeiture-for-competition clauses. However, the Court cannot, at this preliminary stage, determine that the Miller affidavit contains no relevant factual information. Since the Miller affidavit will be considered in the determination of the plaintiffs’ motion, the Court has a duiy to convert the motion to a motion for summary judgment.
The Court therefore moves on to consideration of the cross-motions for summary judgment. This Court allows summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating both elements. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass 805 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat the motion.” Pederson, supra at 17. The nonmoving party’s failure to prove an essential element of its case “renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991), citing Celotex v. Catrett, 477 U.S. 317, 322 (1986).
II. Enforceability of the Forfeiture-for-Competition Clauses
The pivotal issue in this case concerns the enforceability of the forfeiture-for-competition clauses of the defendant’s partnership agreement. The plaintiffs argue that these clauses violate Supreme Judicial Court Disciplinary Rule 2-108(A):
*218 A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits.
Disciplinary Rule 2-108(A) follows Canon 2: “ALawyer Shall Assist the Legal Profession in Fulfilling Its Duty To Make Legal Counsel Available.”
The precise question determining this case — the enforceability of a law firm partnership agreement that financially penalizes attorneys if they leave and compete with the firm — has never been determined in Massachusetts. However, the Supreme Judicial Court discussed a similar issue in Meehan v. Shaughnessy, 404 Mass. 419 (1989). In Meehan, the Court oversaw the dissolution of a law partnership and ruled that a law firm could not prevent any departing partner from removing any of the firm’s current cases, as long as the firm was reimbursed for “the services to and expenditures for the client.” Id. at 431. The Court based this ruling on Disciplinary Rule 2-108(A) and “the strong public interest in allowing clients to retain counsel of their choice.” Id. at 431.
More recently, in Falmouth Ob-Gyn Associates, Inc. v. Abisla, 417 Mass. 176 (1994), the Supreme Judicial Court ruled that a provision in an employment contract between a doctor and a medical organization was void, where the provision bound the doctor to pay $250,000 to the organization if he left employment and entered private practice within 25 miles of his prior place of employment. The Court ruled that the provision, which it referred to as a “compensation-for-competition provision,” was void under G.L.c. 112, §12X.[7] Id. at 182. In making this decision, the Court construed statutory language very similar to that used in Disciplinary Rule 2-108(A), and compared the public interest in patients choosing doctors of their choice with the public interest, discussed in Meehan, of clients choosing lawyers of their choice. From the Meehan and Falmouth Ob-Gyn Associates, Inc. decisions, this Court infers that the Supreme Judicial Court, in the context of attorneys’ partnership agreements, considers that both absolute covenants not to compete and financial compensation-for-competition provisions violate Disciplinary Rule 2-108(A) as restrictions on a departing attorney’s right to practice law.
The majority of United States jurisdictions hold that “direct restrictions” on a lawyer’s ability to practice, i.e. absolute covenants not to compete contained within attorneys’ partnership, shareholder and employment agreements, are unenforceable.[8] See, e.g.: Blackburn v. Sweeney, 637 N.E.2d 1340 (Ind.App. 3 Dist. 1994), vacated as moot 659 N.E.2d 131 (Ind. 1995) (Indiana); White v. Medical Review Consultants, 831 S.W.2d 662 (Mo.App. W.D. 1992) (Missouri); Hackett v. Millbank, Tweed, Hadley & McCloy, 181 A.D.2d 519 (1992) (New York); Spiegel v. Thomas, Mann & Smith, 811 S.W.2d 528 (Tenn. 1991) (Tennessee); Cohen v. Graham, 44 Wash.App. 712 (1986) (Washington); Dwyer v. Jung, 133 N.J.Super. 343 (1975) (New Jersey).
Furthermore, the majority of United States jurisdictions refuse to enforce “indirect restrictions”: provisions that restrict the ability of attorneys to compete by imposing financial penalties. One arrangement that has found disfavor is the linkage of the price at which attorneys are reimbursed for their original capital contributions with their intention to compete or not to compete. In Whiteside v. Griffis & Griffis, P.C., 902 S.W.2d 739, 747 (Tex.App.—Austin 1995), the Court of Appeals of Texas invalidated a clause in a shareholder agreement that linked the value of a departing attorney’s shares in a legal professional corporation to whether the attorney had left to practice in competition with the firm. The contractual mechanism used was a mandatory repurchase provision: under the shareholder agreement, the attorney’s shares became subject to a mandatory repurchase by the corporation when he left the firm. Id. at 741. In Whiteside the court found objectionable the fact that the price at which the corporation repurchased its stock remained at book value if an attorney left the firm to go into competition, but was raised to reflect goodwill if the attorney stayed out of practice. Id. at 744. See also: Hagen v. O’Connell, Goyak & Ball, 68 Or.App. 700 (1984) (invalidation under Disciplinary Rule 2-108(A) of a mandatory repurchase arrangement where the purchase price was reduced by more than 40% if a departing lawyer refused to sign a covenant not to compete); Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg, 461 N.W.2d 598 (Iowa 1990) (voided clause reimbursing attorney-stockholder for capital appreciation of law firm, if attorney did not compete).
Other methods that courts disfavor include paying departing partners financial rewards for noncompetition or imposing financial penalties for competition. For instance, the Court of Appeals of Oregon ruled in Gray v. Martin, 63 Or.App. 173 (1983), that a provision rewarding lawyers who left the firm, but did not compete, with a 36-month stipend of 25% of the share of profits they had received in prior years violated Disciplinary Rule 2-108(A). A similar provision that allowed a firm to renege on promises of future profits if a departing attorney resumed practice in competition with the firm was struck in Cohen v. Lord, Day & Lord, 551 N.Y.S.2d 157 (Ct.App. 1989). In Cohen, the Court of Appeals of New York held unenforceable a clause that stated that if an attorney competed with the firm, “there shall be paid to him no proportion of the net profits of the Partnership collected thereafter, whether for services rendered before or after his withdrawal.” Id. at 158. The court ruled that the clause exacted a significant monetary penalty on competing attorneys and therefore constituted an impermissible restriction on the practice of law under Disciplinary Rule 2- *219 108(A). Id. at 160. The same court later ruled in Denburg v. Parker, Chapin, Flattau & Klimpl, 82 N.Y.2d 375 (1993), that a clause forcing departing partners to repay shares of profits received over a five-year period if they entered into competition with their former firm was void whatever the intentions of the firm’s drafters. See also: Judge v. Bartlett, Pontiff, Stewart & Rhodes, P.C., 197 A.D.2d 148 (1994) (New York) (provision granting departing attorneys portion of death benefit if they do not compete with firm void under 2-108(A), which invalidates all payments made with the principal function of preventing withdrawing partners from competing with the firm); Peroff v. Liddy, Sullivan, Galway, Begler & Peroff, P.C., 852 F.Supp. 239 (S.D.N.Y. 1994) (under New York law, provision reducing partnership income share of accounts receivable granted departing attorneys, where the attorneys continue to represent prior firm clients Void as against public policy).
Similar decisions have been reached in jurisdictions where the Model Rules of Professional Conduct, rather than the Model Code of Professional Responsibility, are the basis for the regulation of lawyers. In Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10 (1992), the Supreme Court of New Jersey ruled that Rule 5.6[9] prohibited a firm from adding a premium to the reimbursement of a departing partner’s capital contribution where the partner did not enter into competition with the firm. The court determined that any “condition[ing] of payment on refraining from practice [in competition with the former firm] violates the Rules of Professional Conduct.” Id. at 25. The court also ruled that the firm could not stop departing lawyers who went into direct competition from contacting its paralegal and secretarial staff. Id. at 31-32. See also: Katchen v. Wolff and Samson, 258 N.J.Super. 474 (1992) (all indirect financial restraints on departing attorney competition void under Rule 5.6); Leonard & Butler, P.C. v. Harris, 279 N.J.Super. 659 (1995) (provision mandating that departing attorneys split fees on cases over which they retain control void as unenforceable financial disincentive to competition); Barna, Guzy & Steffen, Ltd. v. Beens, 541 N.W.2d 354 (Minn. App. 1995) (similar provision in shareholder agreement mandating that departing attorneys pay former law firm 50% of contingent fees recovered void in violation of Rule 5.6).
The policy behind the adoption of Disciplinary Rule 2-108 (A) and Model Rule 5.6 is aimed at protecting clients’ ability to choose their lawyers freely. See, e.g.: Elaine M. Tomko, Enforceability of Agreement Restricting Right of Attorney to Compete With Former Law Firm, 28 A.L.R. 5th 420 (1993); Kevin T. Caiaccio, Howard v. Babcock, The Business of Law Versus The Ethics of Lawyers: Are Noncompetition Covenants Among Law Partners Against Public Policy, 28 Ga. L. Rev. 807 (1994).[10] The importance of client choice animates several other disciplinary rules: for example, situations in which an attorney may withdraw from representing a client are strictly regulated by Disciplinary Rule 2-110, and the practice of dividing a fee among more than one lawyer is made contingent upon client consent by Disciplinary Rule 2-107(B).
Covenants not to compete have the effect of deterring clients from retaining the same attorney after attorneys leave their firm. Public policy demands that the wishes of clients in need of legal representation predominate over the economic interests of attorneys, and disfavors provisions that can force lawyers to experience financial penalties as a consequence of their clients wishing to retain them as counsel. In Anderson v. Aspelmeier, Fisch, Power, Warner and Engberg, supra at 601-02, the Supreme Court of Iowa remarked that the effect of a disfavored forfeiture-for-competition provision was to penalize an attorney “for the clients’ response to his withdrawal, a circumstance which does not justify” the action the firm had taken.
California has adopted a radically dissenting view, permitting everything except broad covenants not to compete in the law firm context.[11] In Howard v. Babcock, 6 Cal.4th 409, 25 Cal.Rptr.2d 80 (1993), a contractual provision awarded departing partners a share of profits for the year following their departure so long as they did not compete with the firm. The Supreme Court of California determined that this penalty amounted only to a reasonable toll on departing, competing partners:
An agreement that assesses a reasonable cost against a partner who chooses to compete with his or her former partners does not restrict the practice of law. Rather, it attaches an economic consequence to a departing partner’s unrestricted choice to pursue a particular kind of practice.
Id. at 419. The court stated that the importance placed by other jurisdictions on the freedom of clients to choose their attorneys was inconsistent with modern business reality. Id. at 423. The court determined that the general rules and habits of commerce had entered and changed the legal profession, and that law firms had a recognizable interest in the investment they had made in their employees. Id. at 422-23. The court adopted a test that balanced “the interests of clients in having the attorney of choice, and the interests of law firms in a stable business environment.” Id. at 425. See also: Haight, Brown and Bonesteel v. Superior Court, 234 Cal.App.3d 963, 285 Cal.Rptr. 845 (1991) (California Rule 1-500(A) permits all restrictions on lawyer competition except outright covenants not to compete).
In Massachusetts no signs portend rejection by our appellate courts of the majority rule or adoption of a quasi-Howard doctrine. In light of the plain language of Disciplinary Rule 2-108(A), the public policies announced in Meehan v. Shaughnessy and Falmouth Ob-Gyn Associates v. Abisla, supra, and the consistency *220 of the invalidation of forfeiture-for-competition clauses outside California, I interpret public policy in the Commonwealth as invalidating all financial restrictions on lawyers’ right to represent clients of choice and clients’ right to choose their lawyers freely, unless the restriction is a conditional payment of retirement benefits.
Morrison, Mahoney & Miller contends that the annual partnership interest credit system is a conditional payment of retirement benefits and therefore enforceable under the “retirement benefit” exception of Disciplinary Rule 2-108(A). This argumentis unpersuasive as a matter of law. The structure of the agreement, its plain wording, and the actual effect of the forfeiture-for-competition clauses belie the defendant’s argument.
The partnership agreement deals with the issue of retirement benefits (§VII, B) in a separate section from that concerning benefits granted to partners who voluntarily withdraw (§VII, D). A reasonable construction of the agreement does not permit the conclusion that all §VII, D sets out is an additional set of retirement benefits. Retirement is defined under §111, B, 3 as “the complete withdrawal of a partner from the active practice of law” (§111, B, 3); it is therefore impossible for a partner to retire and then enter competition with Morrison, Mahoney & Miller. This definition of retirement forecloses the defendant’s argument that the forfeiture-for-competition clauses binding partners who voluntarily withdraw are a system of retirement benefits.
The forfeiture-for-competition clauses of the agreement are not limited in effect to retired partners. Neither of the plaintiffs retired from Morrison, Mahoney & Miller: both voluntarily withdrew under the procedure outlined in §VII, D and consequentally became bound by the noncompetition clause.
The facts set out in the Miller affidavit, indicating the intent of the drafters of the forfeiture-for-competition clauses, cannot modify the fact that the plain language and actual effect of the clauses violate public policy. In his affidavit, Alan Miller characterizes the actual working of the annual partnership interest credit system as a “type of retirement benefits system” (Affidavit at ¶ 12). While the credit system may function in some cases as a mechanism rewarding retired partners for their past work, this does not alter the fact that the system has produced a result here that is contrary to public policy. Such a system would only be enforceable if its effect was confined by its actual language to retired partners. See, e.g.: Miller v. Foulston, Siefkin, Powers & Eberhardt, 246 Kan. 450 (1990) (Kansas) (forfeiture-for-competition clause enforceable where its effect, in theory and in practice, was restricted to retired partners only).
Miller also attempts to define the annual partnership interest credits system as the transfer of an extraordinary payment of future profits to partners who do not engage in competition against Morrison, Mahoney & Miller (Affidavit at ¶20). This definition cannot extinguish the reality of the plain language of the disputed provisions. The system does not reward noncompeting partners with future profits; instead, it holds up the payment of a portion of each partner’s annual earnings, calculated on an accrual system, and refuses to remit this payment entirely if the partner goes into competition. See, e.g.: Cohen v. Lord, Day & Lord, supra at 159 (previously earned but uncollected departure compensation could not upon payment be properly described as a retirement benefit).
Morrison, Mahoney and Miller’s characterization of the annual partnership interest credit as a retirement benefit is therefore incorrect. First, the credit is not a retirement benefit: it is a payment of delayed compensation that reflects work actually performed by the recipients. Second, the noncompetition clause is not limited in effect to retired partners. Morrison, Mahoney and Miller has not shown that either of the plaintiffs “retired” (rather than withdrew) from the firm; the firm cannot deny that, in this instance, its partnership agreement has given rise to a result contrary to public policy. Raphael v. Shapiro, 587 N.Y.S.2d 68 (Sup. 1992) (firm must offer facts to prove that attorneys are actually retired to rely on the retirement benefits exception).
Because the disputed clauses of the Morrison, Mahoney & Miller partnership agreement violate the public policy of the Commonwealth, they are unenforceable and void.
ORDER
For the foregoing reasons, plaintiffs Richard H. Pettingell and Joseph A. Regan’s motion for judgment on the pleadings under Mass.R.Civ.R 12(c) is converted to a motion for summary judgment under Mass.R.Civ.R 56 and ALLOWED. Defendants Morrison, Mahoney and Miller and its partners’ motion for summary judgment is DENIED. Plaintiffs’ motion to strike the Miller affidavit and for severance and continuance under Mass.R.Civ.P. 56(f) is DENIED.

The Morrison, Mahoney & Miller partnership agreement is incorporated by reference into the plaintiffs’ complaint.

Morrison, Mahoney & Miller supplied, as an attachment to the affidavit of Alan Miller, an accounting statement entitled the “Schedule of Partners’ Capital Accounts by Year.” This statement apparently describes the annual partnership interest credits allocated each partner, not each partner’s Paid-In Capital Account.

Mass.R.Civ.P. 12(C) states:
After the pleadings are closed but within such time as to not delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided for in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

Morrison, Mahoney & Miller makes only three assertions in its answer that contravene or deny the allegations of the complaint, as opposed to simply denying knowledge of the truth of the plaintiffs’ allegations. First, Morrison, Mahoney & Miller denies that three of the partners named in Pettingell and Regan’s complaint are current partners of the firm (Answer, ¶5). Second, Morrison, Mahoney & Miller denies the statement in the complaint that “as a result of their withdrawal from MMM (sic), the plaintiffs are entitled to payment of certain capital and accrued income not yet paid out in cash as set forth in the Agreement . . .” (Answer, ¶9). Finally, Morrison, Mahoney & Miller denies the plaintiffs’ statement that “the plaintiffs have demanded payment because non-competition provisions which result in the forfeiture of benefits restrict the right of the plaintiffs to practice law after termination in direct contravention of S.J.C. Rule 3:07 . . . and are therefore void as against public policy” (Answer, ¶ 13). The first of these denials involves a question of fact concerning the proper identity of the defendants to this action best solved by individual motions to dismiss. The second and third denials contravene the plaintiffs’ conclusions of law without adding to the factual record or challenging any of the facts alleged in the complaint.

G.L.c. 112, §12X states in pertinent part:
Any contract or agreement. . . with a physician . . . which includes any restriction of the right of such physician to practice medicine in any geographic area for any period of time after the termination [of the employment relationship] . . . shall be void and unenforceable . . .

The most prominent dissenting view, prevailing in California, is discussed infra.

Rule 5.6, as adopted in New Jersey, states in pertinent part:
A lawyer shall not participate in offering or making ... a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement.

See also, contra: Kirsten Penasack, Abandoning the Per Se Rule Against Law Firm Agreements Anticipating Competition: Comment on Haight, Brown & Bonesteel v. Superior Court of Los Angeles County, 5 Georgetown J. Legal Ethics 889 (1992); Glenn S. Draper, Enforcing Lawyers’ Covenants Not To Compete, 69 Wash. L. Rev. 161 (1994).

California attorneys are subject to Rule 1-500 of its Rules of Professional Conduct, patterned after DR 2-108 (A):
A member shall not be a parly to or participate in offering or making an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of a member to practice law, except that this agreement shall not prohibit such an agreement which:
(1) Is part of an employment, shareholders’ or partnership agreement among members provided the restrictive covenant does not survive the termination of the employment, shareholders’ or partnership relationship; or
(2) Requires payments to a member upon the member’s retirement from the practice of law . . .