**Robert H. NEUMAN, Appellant,**

v.

**Jerome P. AKMAN, et al., Appellees.**

**No. 96–CV–1141.**

District of Columbia Court of Appeals.

Argued Dec. 9, 1997.
Decided Aug. 6, 1998.

Harlan L. Weiss, with whom Irwin H. Liptz, Chevy Chase, MD, was on the brief, for appellant.

James P. Mercurio, Washington, DC, for appellees.

Before STEADMAN and FARRELL, Associate Judges, and BELSON, Senior Judge.

STEADMAN, Associate Judge:

Rule 5.6(a) of the District of Columbia Rules of Professional Conduct bars a "partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement." The issue before us on this appeal is the scope of the "benefits upon retirement" exception.

Appellant Robert Neuman, a former partner in the law firm of Arent Fox Kintner Plotkin & Kahn ("Arent Fox"), challenges the determination of the trial court that the firm did not violate Rule 5.6(a) when, pursuant to its partnership agreement, it denied him a lifetime monetary benefit generally payable beginning at age sixty-five to withdrawing partners who satisfy certain age and longevity requirements or leave the firm by reason of death or permanent disability. The agreement withholds the benefit from those partners who leave, as did Neuman, in order to "engage in the private practice of law anywhere in the United States." Neuman claims that this provision conditioning receipt of the benefit on his not continuing to practice law amounts to an impermissible restraint on his right to do so in violation of Rule 5.6(a). We conclude that the limitation falls comfortably within the Rule's exception for "benefits upon retirement" and therefore affirm the grant of summary judgment by the trial court in favor of Arent Fox.

### I.

The parties have stipulated to the relevant facts before us. Appellant Neuman joined Arent Fox, a law firm based in the District, in 1970 as an associate attorney. On or about January 1, 1973, he became a partner, a status he retained until his voluntary withdrawal on February 5, 1993.[1] Three days after leaving Arent Fox, Neuman commenced the private practice of law with the law firm of Baker & Hostetler in its D.C. office.

At the time of Neuman's withdrawal, Arent Fox had in force a written partnership agreement providing that partners who leave the firm to engage in private law practice would receive their capital contribution and share of the net partnership profits as of their separation date, but would not be entitled to an "Additional Amount" linked to the productivity of the partner over a period of

---

1. At the time of his departure from the firm, Neuman was fifty-six years of age.

years preceding his or her withdrawal. More specifically, paragraph 8 of the agreement divides withdrawing partners into four categories:

> Upon a partner ceasing to be a member of the partnership, the surviving partners shall ascertain whether such occurrence is the result of (a) the decision of the partner to retire and to engage in the private practice of law anywhere in the United States whether as a sole practitioner, a member of, associate with or counsel to any law firm or as employee of any organization in a capacity where such partner's major activities are the handling of legal matters (but excluding (i) the teaching of law, and/or (ii) employment by the federal government or any state or local government—such activities shall be comprehended under (d) below); or (b) death; or (c) permanent disability, *i.e.*, where the partnership determines that, by reason of physical or mental illness or accident, it appears that, for the indefinite future, a partner will be unable to engage, to a substantial degree, in the practice of law, or (d) any other reason including involuntary retirement pursuant to the provisions of Paragraph 9–C ....

Only if the partner leaves the firm under categories (b), (c), or (d) does he or she become eligible to receive, above and beyond the return of his or her capital account and share of net profits, the Additional Amount, defined as the product resulting from the multiplication of two factors, the "Basic Accrued Amount" and the "Vested Status Fraction." It is not necessary to set forth *in toto* the definition of these terms. It suffices to note that the Additional Amount is a factor of both the profits attributable to the withdraw-

ing partner for a period of years preceding withdrawal and that partner's length of service as a partner of the firm. The figure is reduced if the partner withdraws prior to reaching age sixty-five or serving as a partner for twenty years, and is even further reduced if neither of these thresholds is met.

To receive the Additional Amount, a partner leaving the firm under category (d)—that is, one ceasing to be a member of the firm for any reason other than to engage in the private practice of law, death, or permanent disability, but including "involuntary retirement" [2]—must satisfy an age and longevity requirement known as the "rule of 75," which provides that the "sum of the number of full years of his age plus the number of full years he has been a partner of Arent, Fox, Kintner, Plotkin & Kahn ... must equal 75 or more." Apart from this "rule of 75," partners falling within category (d) must not engage in the private practice of law for the two years following their retirement from Arent Fox.[3]

For a former partner falling into categories (c) or (d), who is in the payout provision designated as a "retired" or "retiring" partner, the Additional Amount is dispensed over his or her entire remaining lifetime as follows:

> (A) The Additional Amount shall be reduced by five percent (5%) leaving a 95% reduced Additional Amount which shall be paid in 120 equal monthly installments beginning on the first day of the second month following the retirement of the partner or on the first day of the month following the attainment of age 65 by the retiring partner, whichever is later.[4]

---

2. The definition of this term is found at Paragraph 9–C of the partnership agreement, which has not been made part of the record in this case. From the briefs and oral argument, the parties appear to agree that the term encompasses partners expelled from the firm.

3. Deceased and permanently disabled partners need not satisfy the "rule of 75" to receive the Additional Amount. However, the latter, like category (d) partners, must refrain from the private practice of law for the two-year period following their separation from the firm. It appears that after two years have elapsed, former

partners in categories (c) and (d) can practice law without affecting their payout rights.

4. The agreement provides an exception for partners who withdraw but subsequently die before attaining the age of sixty-five. As to these partners, "the payment of the monthly installments of the full Additional Amount shall commence on the first day of the second month following such death." This exception applies only if the partner did not conduct the private practice of law anywhere in the United States within two years following retirement from the firm.

For partners who retire but do not die before the age of sixty-five, the Additional Amount pay-

(B) If the retiring partner survives the 120th payment there shall be an additional payment made for each month the partner shall live equal to 2-1/2 times the 5% monthly reduction set forth ... above. No such payments shall be made to the estate of the retiring partner following death, or to the spouse or to the estate of the spouse.

Because Neuman left Arent Fox to engage in the private practice of law elsewhere, the firm determined that he left the firm under category (a) of the partnership agreement and thus did not qualify to receive the Additional Amount. Neuman brought suit to recover the benefit, arguing that the provision in the Arent Fox partnership agreement making payment contingent on his decision not to conduct the private practice of law violates public policy as expressed in D.C. RULES OF PROFESSIONAL CONDUCT Rule 5.6(a) (1991), and is therefore unenforceable. The trial court granted summary judgment in favor of Arent Fox, holding that the Additional Amount constituted a "retirement benefit" and, as such, fit within the exception under Rule 5.6(a) to the general prohibition of agreements in restraint of an attorney's right to practice law. We agree with the trial court.

## II.

Rule 5.6 of the D.C. Rules of Professional Conduct provides in full as follows: [5]

A lawyer shall not participate in offering or making:

(a) A partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or

(b) An agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between parties.

It is the exception for "benefits upon retirement" in subsection (a) that we are called upon to construe in this case. To properly undertake this inquiry, it may be useful first to examine the nature of the general rule proscribing covenants in restraint of the practice of law.

### A.

The text of Rule 5.6(a) provides little guidance as to its full purpose and scope. The comment accompanying the rule is succinct as to its public policy undergirding:

An agreement restricting the right of partners or associates to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer. Paragraph (a) prohibits such agreements except for restrictions incident to provisions concerning retirement benefits for service with the firm.

D.C. RULES OF PROFESSIONAL CONDUCT Rule 5.6(a) cmt. [1] (1991). As one leading treatise elaborates, "Rule 5.6(a) is designed, in part, to protect lawyers, particularly young lawyers, from bargaining away their right to open their own offices after they end an association with a firm or other legal employer. It also protects future clients against having only a restricted pool of attorneys from which to choose." 2 GEOFFREY C. HAZ-

ments may be commenced prior to reaching that age at the "sole election" of Arent Fox, but only if the partner does not, after the retirement date, "engage in any other meaningful employment."

**5.** The language of Rule 5.6(a) parallels that of its predecessor, DR 2-108(A) of the former D.C.Code of Professional Responsibility, which provides, "A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits."

Both the current D.C. Rules of Professional Conduct and the former D.C.Code of Profession-

al Responsibility were adapted from model disciplinary codes drafted by the American Bar Association ("ABA"). *See* D.C. RULES OF PROFESSIONAL CONDUCT preface (1991). In the discussion that follows, we consider judicial and ethics-committee interpretations of state ethics rules, the counterparts to D.C. Rule 5.6(a) and former D.C. DR 2-108(A), also derived from these ABA codes. We discern no meaningful variation in the language of the respective state codes with regard to the rule prohibiting agreements in restraint of the practice of a lawyer, and have freely consulted the various sources we have found that construe those codes.

ARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 5.6:201, at 824 (2d ed. Supp. 1997). Similarly, a seminal ABA ethics committee decision describes the bar on restrictive covenants among lawyers as a protection for both clients and lawyers:

"Clients are not merchandise. Lawyers are not tradesmen. They have nothing to sell but personal service. An attempt, therefore, to barter in clients, would appear to be inconsistent with the best concepts of our professional status." It appears to this Committee that a restrictive covenant [prohibiting for two years a terminated attorney from practicing law in the city and county in which his former attorney-employer practices] would be an attempt to "barter in clients...." [Furthermore,] a general covenant restricting an employed lawyer, after leaving the employment, from practicing in the community for a stated period, appears to this Committee to be an unwarranted restriction on the right of a lawyer to choose where he will practice and inconsistent with our professional status.

ABA Comm. on Professional Ethics, Formal Op. 300 (1961) (quoting ABA Comm. on Professional Ethics and Grievances, Formal Op. 266 (1945)). See also ABA Comm. on Professional Ethics, Informal Op. 1072 (1968). Our own legal ethics panel in the District has also spoken on the subject:

The ABA and court decisions ... demonstrate a general hostility toward restrictive agreements and persuade this Committee that it should carefully examine any such agreements that come before it.... While a law firm undoubtedly has a legitimate interest in maintaining its clients, we are hesitant to announce views that unduly restrict the ability of lawyers to change relationships in order to advance their careers, or that prevent or unduly hinder clients from obtaining legal representation from attorneys of their own choosing who may have formed new associations.

Legal Ethics Comm. of the District of Columbia Bar, Op. 181 (1987), reprinted in 115 Daily Wash. L. Rptr. 1141, 1146 (June 4, 1987); see also Legal Ethics Comm. of the District of Columbia Bar, Op. 241 (1993) (de-

scribing Rule 5.6(a) as a mechanism "to protect the ability of clients to obtain lawyers of their own choosing and to enable lawyers to advance their careers"). Accord, Meehan v. Shaughnessy, 404 Mass. 419, 535 N.E.2d 1255, 1262 (1989); Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142, 147 (1992); Cohen v. Lord, Day & Lord, 75 N.Y.2d 95, 551 N.Y.S.2d 157, 550 N.E.2d 410, 411 (1989); Spiegel v. Thomas, Mann & Smith, 811 S.W.2d 528, 530 (Tenn. 1991); ROBERT W. HILLMAN, HILLMAN ON LAWYER MOBILITY § 2.3.3 (2d ed.1998).

Although the purposes of Rule 5.6(a) may be thus generally stated, the full extent of the prohibition on agreements in restraint of the practice of law and, significantly for the instant case, the precise meaning of the exception for "benefits upon retirement" are "not crystal clear." 2 HAZARD & HODES, supra, § 5.6:201, at 824. A fundamental principle of statutory construction is that we must give effect to the plain meaning of a statutory phrase, to the extent discernible. See Berryman v. Thorne, 700 A.2d 181, 184 (D.C. 1997). However, we are unable here to rely purely on the plain language of the rule, for as commonly understood—and as we had occasion to observe in a recent case in this court also involving a withdrawing partner— the word "retire" is susceptible to varying meanings depending on the reference to which it is made. See Gryce v. Lavine, 675 A.2d 67 (D.C.1996). In one sense, it connotes a permanent withdrawal from gainful employment altogether, namely, "[t]o give up business or public life and live on one's income, savings, or pension." WEBSTER'S II NEW COLLEGE DICTIONARY 947 (1995). However, "retire" may also refer simply to withdrawal from a particular occupation or even from a particular position within an occupation. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1939 (1981).

This distinction may be no small matter. If "retirement" denotes simply withdrawal from the firm, then any benefit offered to withdrawing partners may ethically be held contingent upon the partner's refraining from the practice of law. On the other hand, if the word is understood more narrowly to mean, for example, "withdrawal from the

practice of law," then only the benefits intended for those who so withdraw may be withheld from a departing partner who continues practicing. Clearly, the broader the scope of the term, the weaker the prohibition on attorney-practice restraints becomes, and the more likely a particular benefit in question does not contravene the rule.

In addition to determining the scope of the word "retirement," we also must consider the meaning of "benefits." A decision of the New York Court of Appeals, further discussed *infra*, appears to differentiate between income a partner has already earned and a future distribution of law firm profits, suggesting that limitations on the former may never be judicially condoned while restrictions on the latter are permitted, if conditioned on retirement, insofar as they constitute "benefits." *See Cohen v. Lord, Day & Lord, supra*, 551 N.Y.S.2d 157, 550 N.E.2d at 413. Thus a distinction may be drawn between amounts in which a partner has what might be termed a presently earned and vested interest and collateral amounts that come from firm earnings that post-date the partner's tenure.[6]

We have never had occasion to interpret and apply in a definitive sense any part of Rule 5.6(a).[7] However, various state courts have done so under parallel professional responsibility codes, and state ethics committee opinions abound on the subject. We turn to these authorities for guidance on the meaning of Rule 5.6(a) and, specifically, of the term "benefits upon retirement." [8]

### B.

In perhaps the leading case interpreting Rule 5.6(a) or its equivalent, *Cohen v. Lord, Day & Lord, supra*, the New York Court of Appeals invalidated a law firm partnership agreement which conditioned payment of earned but uncollected partnership revenues on a withdrawing partner's decision to refrain from the practice of law. Specifically,

**6.** A law firm partnership agreement may modify the default arrangement, imposed by statute, that when a partner withdraws, the partnership itself dissolves, thereby entitling each partner to an accounting for the amount of his or her interest. *See generally* D.C.Code § 41–158.1 (1998). As consideration for the partner foregoing this otherwise statutory right, a partnership agreement may guarantee the payment to the departing partner of various items, including his or her capital account, net profits earned to the date of retirement, and, perhaps, deferred compensation representing the amount of billed but theretofore uncollected fees. It is also possible that, because of difficulties in accounting for a partner's precise share of the partnership, the firm might provide the withdrawing partner with a finite, post-retirement stream of payments to remedy the deficiency. These items may be contrasted with "true retirement benefits," which represent something extra, something beyond what the partner already owns. *See Pierce v. Hand, Arendall, Bedsole, Greaves & Johnston*, 678 So.2d 765, 770 (Ala.1996).

In this regard, Neuman makes no effort to identify what the Additional Amount actually is. Instead he focuses on what the payment is not. We are mindful of the reality that a firm might provide its departing partners with all of the payments noted above, as well as an additional sum to reflect the partners' respective share in the firm's goodwill. *See, e.g., Gryce, supra*, 675 A.2d at 69 & n. 2. Unlike in *Gryce*, however, there is no indication that the Arent Fox agreement before us intends to compensate for goodwill. On the contrary, there is every indication, based on a totality of factors, *see infra*, that the Additional Amount is meant as a retirement benefit and does not represent a deferred payout of a current asset.

**7.** In *Gryce, supra*, we took note of Rule 5.6(a) and its possible relevance to the interpretation of a partnership agreement so as to avoid any possible infringement of the rule. *See* 675 A.2d at 70 n. 3.

**8.** Because we hold that the Arent, Fox benefit in question here falls within the "benefits upon retirement" exception of Rule 5.6(a), it is unnecessary to consider whether or not the partnership agreement provisions withholding the benefit actually constitute a restriction on the right to practice law within the meaning of the rule. We do note that courts have often invalidated various types of financial disincentives as indirect restraints on the practice of law, finding them sufficiently opprobrious to be barred by the ethical rule. *See, e.g., Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg*, 461 N.W.2d 598, 601–02 (Iowa 1990); *Pettingell v. Morrison, Mahoney & Miller*, 426 Mass. 253, 687 N.E.2d 1237, 1240 (1997); *Jacob, supra*, 607 A.2d at 148; *Cohen, supra*, 551 N.Y.S.2d 157, 550 N.E.2d at 411; *Gray v. Martin*, 63 Or.App. 173, 663 P.2d 1285, 1290 (1983); *Spiegel, supra*, 811 S.W.2d at 529–31. *But see Howard v. Babcock*, 6 Cal.4th 409, 25 Cal.Rptr.2d 80, 863 P.2d 150, 156 (1993) ("An agreement that assesses a reasonable cost against a partner who chooses to compete with his or her former partners does not restrict the practice of law.").

the Lord, Day & Lord ("LD & L") firm sought to deny the former head of its tax department, Richard G. Cohen, "departure compensation" ordinarily paid to withdrawing partners over a three-year period on the basis of the following "forfeiture-for-competition" clause contained in the agreement:

[I]f a partner withdraws from the Partnership and ... continues to practice law in any state or other jurisdiction in which the Partnership maintains an office or any contiguous jurisdiction ..., he shall have no further interest in and there shall be paid to him no proportion of the net profits of the Partnership collected thereafter, whether for services rendered before or after his withdrawal.

*Id.* 551 N.Y.S.2d 157, 550 N.E.2d at 410–11 (emphasis omitted). The Court of Appeals rejected LD & L's claims that (1) the forfeiture-for-competition clause was a mere financial disincentive which did not operate as a "blanket" restraint on Cohen's ability to practice law, and (2) in any event, the departure compensation constituted a retirement benefit within the exception of DR 2–108(A). Writing for the court's majority, Judge Bellacosa stated,

We hold that while the provision in question does not expressly or completely prohibit a withdrawing partner from engaging in the practice of law, the significant monetary penalty it exacts, if the withdrawing partner practices competitively with the former firm, constitutes an impermissible restriction on the practice of law. The forfeiture-for-competition provision would functionally and realistically discourage and foreclose a withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel.

*Id.* 551 N.Y.S.2d 157, 550 N.E.2d at 411.

Three reasons were cited to explain why the provision did not fit within the "retirement benefits" exception. First, the LD & L partnership agreement contained an entirely separate section specifically dedicated to retirement benefits that excluded withdrawing partners. Second, in contradistinction to the retirement benefits clause, which provided for payment until the death of the retiring partner and even possibly to a surviving spouse, the departure compensation was "temporally limited" to the three-year period following withdrawal. Finally, the majority stated, to equate the departure compensation with a retirement benefit "would invert the exception into the general rule, thus significantly undermining the prohibition against restraints on lawyers practicing law." *Id.* 551 N.Y.S.2d 157, 550 N.E.2d at 412.

Criticizing the majority's treatment of the "retirement benefits" exception, Chief Judge Wachtler offered the following alternative construction:

In my view, the "retirement benefits" exception to DR 2–108(A) means simply that lawyers can agree to make the payment of financial benefits, otherwise payable upon termination of the partnership relationship, contingent upon retirement. Thus understood, retirement benefits are, quite simply, those payable only upon retirement. That plaintiff is not retiring from the practice of law does not mean that the benefits he claims cannot be considered retirement benefits; it means instead that, under the agreement, he is not entitled to the benefits. If the exception for retirement benefits could not be invoked in any case where a withdrawing partner does not wish to retire, then it can never be invoked. The only purpose the exception can possibly serve is to allow a firm to withhold benefits from a withdrawing partner who intends to continue the practice of law.

*Id.* 551 N.Y.S.2d 157, 550 N.E.2d at 420 (Wachtler, C.J., dissenting).

To counteract this view, as well as the dissent of another judge, the majority restricted its holding to the particular partnership agreement before it, cautioning "against a categorical interpretation or application." *Id.* 551 N.Y.S.2d 157, 550 N.E.2d at 413. The court further noted that its result turned "on a careful assessment of the true issue and effect of the contested clause—entitlement to earned uncollected fees during the tenure of the partner as a working member of the firm, not to future distributions...." *Id.* (internal quotation marks omitted). The

majority decision prevented a forfeiture of already "earned income." *Id.*

The Supreme Court of Kansas has also confronted a challenge to a law firm partnership agreement on DR 2–108(A) grounds. In *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, 790 P.2d 404 (1990), the court upheld a restriction on the right of an expelled partner to receive a "retirement" payment—an amount equal to the partner's share of profits for either the first or second year preceding expulsion, whichever is greater—based on the partner's obligation not to practice law. The partnership agreement generally made the payment available to those partners who withdrew "for the purpose of retiring from the practice of law" or were expelled for other than acts of moral turpitude, and who also satisfied either age or longevity requirements or who were deemed permanently disabled. *See id.* 790 P.2d at 408.

The court found the Foulston, Siefkin payments to "fit[ ] squarely within the exception of DR 2–108(A)," emphasizing that in order to qualify to receive them, the expelled partner had to either reach sixty years of age, remain associated with the firm for thirty years, or be rendered permanently incapacitated by a physical or mental disability. *Id.* at 410. It is these conditions that rendered the payments "retirement benefits." *Id.* at 410–11.[9]

In another case, *Gray v. Martin, supra* note 8, 663 P.2d at 1290, an Oregon court ruled that the clause of a partnership agreement conditioning a monetary payment—available to all partners whether they withdrew, retired, or were expelled—on the partners' adherence to geographic law-practice limitations violated the prohibition of DR 2–108(A) and did not qualify under the retirement benefits exception. The exception did not apply, the court held, because the agreement did not discriminate between retiring and withdrawing partners:

> The agreement is not a condition to payment of retirement benefits as plaintiffs claim. If retirement has the same meaning as withdrawal in DR 2–108(A), then the disciplinary rule has no meaning. Every termination of a relationship between law partners would be a retirement, and agreements restricting the right to practice would always be allowed.

*Id.*

Commenting on *Gray*, Professor Hillman finds that its "analysis is correct" but that it "provides no guidance for determining the type of withdrawal that qualifies as a retirement." HILLMAN, *supra*, § 2.3.5, at 2:85. For this guidance, he looks to the opinion of a Virginia ethics committee which, much like the majority opinion in *Cohen*, perceives a distinction between "benefits that amount to deferred compensation and benefits funded by the firm or a third party and concludes only the latter qualify as retirement benefits." *Id.* The ethics committee held,

> "It is our opinion that a plan containing a clause which would prohibit a lawyer from withdrawing compensation already earned ... would be in violation of the Disciplinary Rule, but only to the extent that the plan involved deferred compensation. To the extent that the benefits from such a plan came from funding by the employer corporation or partnership or third parties, then the exception to the basic rule should prevail and the restriction on the right to practice ... should be acceptable."

*Id.* (quoting Standing Comm. on Legal Ethics of the Va. State Bar, Op. 880 (1987)).[10]

Professor Hillman also refers approvingly to the majority opinion in *Cohen*, stating that

> [t]he most meaningful and specific guidance offered in the opinion for defining "retirement" benefits ... is the temporal notion that retirement benefits "extend to

---

9. The court also noted that "the agreement offers the same retirement benefit payments to an expelled partner who qualifies for retirement" as received by partners withdrawing from the practice of law. *Miller, supra*, 790 P.2d at 411.

10. Professor Hillman proceeds to criticize this approach, noting that the source of benefits is difficult to trace. "In a law firm, partners 'fund' their own postwithdrawal benefits by accepting less in the way of present compensation in exchange for payments in the future. Any benefit paid to a withdrawing partner is a form of deferred compensation." HILLMAN, *supra*, § 2.3.5, at 2:85.

the death of the retiring partner and then may even continue to the partner's surviving spouse," while the departure payments under the agreement at issue ended after three years.

*Id.* at 2:87 (quoting *Cohen, supra,* 551 N.Y.S.2d 157, 550 N.E.2d at 412). Finally, after evaluating other prevailing authorities on the subject, Professor Hillman suggests that the applicability of the retirement benefits exception centers on whether the firm's purpose in providing departure payments is in fact to fund its partners' retirement from the practice of law.[11] He lists three criteria helpful to this inquiry: (1) the presence of minimum age and service requirements; (2) the existence of provisions dealing independently with withdrawal for purposes of retirement and withdrawal for other reasons; and (3) the period over which the payments are to be made. *See id.* at 2:89–90. *See also* Legal Ethics Comm. of the South Carolina Bar, Advisory Op. 91–20 (1991) ("[A] partnership agreement should not violate Rule 5.6(a) if withdrawal benefits are clearly specified, qualifications for retirement are specified and are similar to those found in other business settings, retirement benefits are in addition to withdrawal benefits, and expelled partners who retire from practice are entitled to retirement benefits.").

An opinion of a Connecticut ethics committee resolves the ambiguity of the phrase "retirement benefits" in much the same way as Professor Hillman and as Professors Hazard and Hodes. *See* Legal Ethics Comm. of the Connecticut Bar, Informal Op. 89–26 (1989); 2 HAZARD & HODES, *supra,* § 5.6:201, at 824 (explaining that "benefits upon retirement" "appears to mean that when a lawyer is retiring or winding up his affairs with a firm, he may be required to agree to 'stay retired' as a condition of obtaining payouts from future earnings of the firm"). In that decision, the committee was asked to inter-

pret a proposed change to a partnership agreement that granted each partner who voluntarily withdrew from the firm, regardless of subsequent activities, a payment equal in value to the partner's interest in firm real estate holdings. The change would classify partners according to whether they continued practicing law within a specific geographic area after withdrawal. "Active" partners, those who practiced within the proscribed territory, would receive only half of the payment that they would otherwise be entitled to. "Inactive" partners, those who did not practice in competition with the firm, would receive the full payment.

The committee adopted the reasoning of *Cohen* and *Gray,* concluding that the proposed financial disincentive was a restriction on the practice of law within the meaning of Rule 5.6(a). The committee then proceeded to determine whether the payment provided for in the partnership agreement constituted a "benefit upon retirement." Applying "traditional rules of statutory construction," the committee concluded that the word "retirement"

> means a cessation of private law practice with an intention, and the expectation by others, that the cessation will be permanent. It does not include cessation with the intent by the partner involved, and the expectation of others, that the private practice of law will soon be resumed through a different professional relationship.

Legal Ethics Comm. of the Connecticut Bar, Informal Op. 89–26.

Applying this construction of the retirement benefits exception in a later opinion, the Connecticut ethics committee upheld a partnership agreement that imposed territorial limitations on a departing partner who opted to receive a deferred compensation

---

11. The professor points out that the partnership agreement truly meant for the retirement benefits exception is that which recognizes that some partners, upon reaching a certain age, "will cease practicing law and as a result suffer a substantial drop in income." HILLMAN, *supra,* § 2.3.5, at 2:89. He reasons,

> Only this ... type of agreement pertains to "retirement" as that term is customarily used.

And it is only the benefits that are payable pursuant to such agreements that fit comfortably within the retirement exception to the ban on restrictive covenants. When a partner 're-tires' and then proceeds to compete with the firm, the premise upon which retirement benefits have been based is undermined.

*Id.*

package. *See* Legal Ethics Comm. of the Connecticut Bar, Informal Op. 90–21 (1990). Only a partner who withdrew on or after his or her 62nd birthday, or by reason of death, permanent disability, or discharge by the firm without cause would be eligible for the compensation. The committee held,

> [I]t is our opinion that the two instances in which you seek to condition receipt of deferred compensation upon an agreement restricting the employee's right to practice—withdrawal on or after the 62nd birthday or permanent disability—are instances in which it may legitimately be inferred that the lawyer intends to retire from the practice of law. The deferred compensation thus constitutes "benefits on retirement" within the meaning of the Rule and is permissible.

*Id.* The committee explained that "[i]t is clearly legitimate to presume" that those withdrawing from the firm because of permanent disability or because they have reached sixty-two years of age intend to retire from the practice of law. *Id.* The committee noted that individuals of that age are eligible for social security retirement benefits. The two instances of permanent disability and reaching age sixty-two are, in the committee's view, "occasions of retirement." *Id.*

## III.

Surveying the various approaches that these authorities have taken to the application of Rule 5.6(a), we think that even under the most restrictive of extant interpretations, the Arent Fox agreement's provisions at issue here fall within the exception for "benefits upon retirement." Unlike the benefits at issue in *Cohen,* the Additional Amount comes entirely from firm profits that post-date the withdrawal of the partner.[12] Under the partnership agreement, Neuman will recover his capital account and his "share of net profits of the partnership for the portion of the fiscal year of retirement ending on the date of retirement" regardless of his choice to continue practicing law in competition with the firm. It is only future firm revenues that Neuman will be deprived of, and only because he is at least potentially competing with the firm and effecting a depression of those revenues.[13]

Furthermore, the Arent Fox agreement requires that partners, excepting the deceased and permanently disabled, satisfy the "rule of 75" to be eligible for any benefits at all. This guarantees that partners normally are at or nearing the age at which many Americans typically cease employment. *See Miller, supra,* 790 P.2d at 404 (characterizing benefit as "retirement benefit" where, to

---

12. There is no language in the partnership agreement to suggest that the Additional Amount is funded in any traceable manner by the partner receiving the benefit. Highlighting this fact, the agreement disclaims any obligation of the firm to pay out greater than six percent of the firm's "current distributable cash flow," defined as "the amount of cash and the fair market value of property, other than cash, distributed to partners and estates of deceased or retired partners, but excluding capital distributions to partners," in any given year to claimants, collectively, of the Additional Amount.

13. While the agreement places within category (a) withdrawing partners who continue to practice law "anywhere in the United States" and not necessarily in competition with Arent Fox, some latitude in this regard must realistically be granted in the light of modern nationwide law practice by major firms. Indeed, the application of the exclusion to all withdrawing partners who continue to practice law enhances the "retirement" nature of the contemplated "benefit."

The limited *anticompetitive* effect of the plan is also demonstrated by the fact that even a partner who is expelled or who retires with the expectation of not practicing law may nonetheless resume the practice of law elsewhere after a two-year period without losing rights under the plan. Not too much should be made of this provision, insofar as it discriminates between those who leave to immediately engage in the practice of law elsewhere and those who do not do so until after two years have passed. In a realistic sense, departures of the latter nature would appear to be unlikely, even with respect to expelled partners.

It is also worth noting that the immediate loss of clients moving with the departing partner and the consequent diminution in firm revenues available to pay the Additional Amount is significantly mitigated by the provision for the two-year moratorium on law practice. This fear was emphasized in *Howard v. Babcock, supra* note 8, 25 Cal.Rptr.2d 80, 863 P.2d at 160, where the Supreme Court of California sought to balance, based on the modern decline in partner loyalty to their firms, "the interests of clients in having the attorney of choice[ ] and the interest of law firms in a stable business environment."

qualify, partners must satisfy age, longevity, or disability requirements); Legal Ethics Comm. of the Connecticut Bar, Informal Op. 90–21 (referring to age as an "occasion of retirement"). Moreover, even as to those partners who satisfy the "rule of 75," actual payment of the benefit only commences after he or she reaches at least the age of sixty-five, and if withdrawal occurred prior to that age or prior to the partner serving at the firm for twenty years, the partner then only receives a reduced Additional Amount.[14] Finally, as with the retirement benefits spoken of in *Cohen*, the Additional Amount is paid over the entire remaining lifetime of the retiring partner,[15] a fact that "supports the conclusion that the payments are in fact for the purpose of funding a retirement." *See* HILLMAN, *supra*, § 2.3.5, at 2:91.[16]

These features distinguish this case from *Gray*, where "any partner" could receive an additional "Payment for [P]artner's Interest" so long as he or she satisfied a territorial practice limitation, regardless of the partner's age, tenure at the firm, or intent to continue practicing law outside the proscribed region. *See Gray, supra*, 663 P.2d at 1290. Moreover, the benefit in *Gray* was payable over a two-year period, not the typical duration of a benefit intended to sustain one for the long-term in the absence of a regular salary.

Neuman argues that the Arent Fox agreement is unenforceable for the singular reason that it denies him—and not expelled partners, disabled partners, the estates of deceased partners, and partners who withdraw voluntarily and who do not continue the private practice of law—the Additional Amount solely because he chose to compete with his former law firm. However, Rule 5.6(a) per-

mits just such a provision in an "agreement concerning benefits upon retirement." That expelled partners, for example, receive the payout regardless of any intention to resume the private practice of law after a two-year period does not, in our view, significantly change the character of the benefit in any overall sense. *See* note 13, *supra.* On balance, the various indicia of "benefits upon retirement" as set out in the above authorities are present here and operate to validate the Arent Fox agreement in the respect challenged here.

At bottom, Neuman would seem to have us require that all retirement plans be deemed "vested" regardless of the reason for a partner's withdrawal from a firm; otherwise, he maintains, the financial disincentive imposed by the firm would inhibit freedom of competition among lawyers. The most that Neuman's argument might permit would appear to be a provision that would merely suspend the payment of benefits under a retirement plan for such period of time as the withdrawing partner competes with the firm in the practice of law. No authority has read the "benefits upon retirement" exception of Rule 5.6(a) so restrictively.[17] Although retirement provisions may play an increasing part in total compensation packages, we do not think that the ethics rule by itself can be interpreted to view all partnership retirement rights as "vested" regardless of the reason for withdrawal from the firm.

We do not doubt that scrutiny is warranted of asserted "benefits upon retirement" which may be lost upon withdrawal from a firm to continue the practice of law elsewhere. We are satisfied, however, that the challenged provision in the Arent Fox part-

---

14. As noted earlier, *see* note 4, *supra*, the partnership may elect to commence payment of the reduced Additional Amount before the partner attains age sixty-five, where the partner does not thereafter "engage in any meaningful employment." This further reveals the firm's motivation to provide benefits to those partners who will experience a permanent reduction in income on account of their withdrawal.

15. It is true that the bulk of the Additional Amount is paid over the first ten years, but payment in a reduced amount does continue for the lifetime of the partner.

16. Neuman cites the fact that the Additional Amount is paid to the estates of partners who retire and die before reaching age sixty-five as a basis for us to conclude that the payout is not a "benefit upon retirement." However, we do not find this feature conclusive, one way or another.

17. In fact, such a reading would be more plausible under the wording of former DR 2–108(A). *See* note 5, *supra*.

nership agreement falls within the exception of the ethics rule.

*Affirmed.*